John A. Roebling's Sons' Company

*v.*

The Lock Stitch Fence Company.

*Filed at Ottawa October 31, 1889.*

1. Contracts—*notice of refusal to perform—rights and remedy of the other party.* Where one party to a contract gives notice before the time of performance arrives that he does not intend to perform, the other party may treat such notice as a breach, and bring his action, or he may decline to accept the notice as a breach, and insist that the contract shall continue in force up to the time fixed for its final performance, holding the party refusing to perform, responsible for the consequences of his refusal.

2. One party to a contract can not, by simply refusing to carry out his part of it, compel the other party to rescind it. The latter has a right to keep the contract alive notwithstanding such refusal, and may go on and perform his part even though notified by the other that he will not perform.

3. So where a party to a contract for the sale and delivery of a certain commodity notified the vendor not to make any further shipments under the contract, and the vendor distinctly refused to stop the shipments, it was *held*, that the vendor thereby elected to continue the contract in force, and did thereby keep the same alive, not only for the vendor's own benefit, but also for that of the vendee. In such case, the

vendor will remain liable to all his own duties and obligations, and in a suit by the vendor against the vendee, on the contract, the plaintiff must prove he was ready, willing and able to perform.

4. SAME—*seller's ability to perform—so as to hold the buyer liable—evidence.* In an action upon a contract by the vendor against the vendee, for refusing to accept and pay for goods bought by him, the fact that the vendor, after notice of the vendee's repudiation of the contract, failed to have the requisite amount of the goods shipped to the place of delivery at the times specified in the contract, if relied on by the defendant as showing the plaintiff's inability to perform, may be explained by the circumstances, so as to show such delay was by mutual consent, or was not the fault of the plaintiff.

5. Where goods shipped by rail are tendered by the vendor to the vendee without the payment of freight, but no objection is made to the tender on that ground, and the proof shows there was an understanding between the shipper and the carrier whereby the shipper obtained credits and afterward paid such freight, it was *held*, that it was for the jury to take all these and other circumstances into consideration in determining whether the delay in paying the freight showed a want of readiness and ability of the vendor to perform.

6. SALE—*failure of buyer to pay—re-sale by the seller.* Where a vendee of goods sold at a specific price refuses to take and pay for the goods, the vendor may re-sell the same, and charge the vendee with the difference between the contract price and that realized at the sale. But the sale must be fair, and must be made in good faith, and in the mode best calculated to produce the real value of the goods.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. GEORGE W. STIPP, Judge, presiding.

This is an action of assumpsit, commenced in the Circuit Court of Will County, on September 4, 1885, by the appellant, a corporation organized under the laws of New Jersey and engaged in the manufacture and sale of galvanized fence wire at Trenton in that State, against the appellee, a corporation organized under the laws of Illinois and engaged in the business of making and selling barbed fence wire at Joliet in the latter State, to recover damages for a breach of contract, and also to recover the amount of a balance claimed to be due for goods sold and delivered under said contract.

The contract sued upon is embodied in the following letters: 1st, a letter from appellant to appellee, dated Feb. 27, 1885, saying:   *   *   *,   "we telegraphed you that we had all of your wire made.   Two cars have been shipped on your letter of the 9th, and the third one is being loaded now.   Let us know how fast we shall ship the balance.   *   *   *   We can make a lot of galv. fence wire now, but cannot stand some of the prices we hear of.   The best we can do, on say, 500 tons, is $3.65 per 100 (lbs.), usual terms.   Shipments about as you have had them;"  2nd, a letter from appellee to appellant, dated March 3, 1885, saying: "Yours of the 27th inst. at hand. Please enter our order for 500 tons of galvanized fence wire in proportion of 78 per cent No. 12 and 22 per cent No. 13 @ $3.65 per 100 (lbs.) delivered in Joliet 60 days, or 2 per cent cash in 10 days, from receipt of wire.   Delivery between now and July 1.   You can ship 20 tons per week to balance old order, and then the same on this until we say different," etc.;  3d, a letter from appellant to appellee, dated March 7, 1885, saying: "Yours of 3d received.   Have entered your order for 500 tons galvanized fence wire, 78 per cent No. 12 and 22 per cent No. 13, delivery between now and July 1, 1885, at rate of 20 tons per week after completion of present order.   Price $3.65 del'd at Joliet 60 days, or 2 per cent for cash in 10 days."

Under this contract, appellant shipped 120 tons of fence wire, which were accepted by appellee.   The last shipment, which was accepted, was made by appellant on April 21, and received by appellee at Joliet on April 27.   The price of fence wire began to decline in the middle of March, 1885, and continued to decline until the early part of July, 1885.   On April 27, 1885, appellee telegraphed to appellant:   "Stop shipment and cancel our order."   On the same day appellee wrote to appellant, confirming the telegram, repeating the direction to cancel the order, and stating that the wire could not be used "owing to its quality."   On April 29 appellant

telegraphed to appellee : "We cannot agree to stop shipment. All the wire has been tested here before shipment," to which appellee telegraphed in reply : "Telegram received. Will not take wire if shipped. Cannot use the quality." On April 30 appellant wrote to appellee acknowledging the receipt of the telegram of the 29th, and stating that they could not stop shipments ; that they had bought the rods and were obliged to take them ; that they had made a contract with the R. R. Co. for shipments at certain freight rates ; that they had tested the wire before shipping it, and had done everything to make it right ; that appellee had not explained what the trouble was ; that their Mr. Shippy would leave during the week for Joliet, and that they hoped the matter would be adjusted.

. Early in May appellant sent its manager, Shippy, to Joliet to examine the wire, and upon his return wrote to appellee a letter, dated May 15, 1885, saying, that Shippy had reported and brought back samples, that the quality was not such as to justify the course taken by appellee, that a car of wire was then being loaded for Joliet, that the foreman would test every bundle, that it was impossible to cancel the order, and that, if a little of the wire was poor, appellee could return it, etc. In reply to this letter, appellee telegraphed on May 18 : "Letter received. Will not receive wire if shipped." On May 23, appellant again wrote : "Whatever wire of inferior quality there may be among any of the shipments * * * may be returned to us. While we * * * regret that some poor wire was sent you, we cannot agree to cancel your contract on that account."

Appellant shipped the remaining 380 tons to Joliet between May 16, 1885, and June 23, 1885, the shipment of May 16 reaching Joliet on May 24, and that of June 23 arriving in Joliet on June 29, 1885. The 380 tons were tendered to appellee, who refused to receive them. Appellant gave notice to appellee that the wire would be sold. After notice of sale by advertisement, the wire was sold at public auction in Joliet,

the last of it being so sold on July 6, 1885. The difference between the contract price and the amount realized from the sales was $3293.86, without taking into the account interest or expenses of sale.

The defendant below introduced no testimony except upon the question as to whether the 120 tons accepted had been paid for or not. Upon the trial below, the jury returned a verdict in favor of plaintiff below, the appellant here, for $234.93, being the amount, without interest, claimed by appellant to be due and unpaid on the 120 tons received by appellee. The Circuit Court entered judgment upon this verdict, which judgment has been affirmed by the Appellate Court.

Mr. C. W. Brown, and Mr. F. Bennitt, for the appellant:

The vendor of personal property, in a suit against the vendee for not taking and paying for the property, may sell the same, and recover the difference between the contract price and the price of re-sale. *Bagley* v. *Findlay*, 82 Ill. 524; *Saladin* v. *Mitchell*, 45 id. 84; *Ullmann* v. *Kent*, 60 id. 272; Benjamin on Sales, (3d ed.) 777, and notes.

When goods are sold to be delivered in the future, the vendee can not create a breach of the contract by giving notice that he will not receive the goods. *Kadish* v. *Young*, 108 Ill. 171; *McPherson* v. *Walker*, 40 id. 371; *Chamber of Commerce* v. *Sollitt*, 43 id. 519.

The rule is, if one bound to perform a future act, before the time for doing it declares his intention not to do it, this, of itself, creates no breach of his contract; but if this declaration be not withdrawn when the time arrives for the act to be done, it constitutes a sufficient excuse for the default of the other party. *McPherson* v. *Walker*, 40 Ill. 371; *Cummings* v. *Tilton*, 44 id. 173; Benjamin on Sales, (3d ed.) p. 748, sec. 760.

In actions upon contracts, it is necessary to aver, in the declaration, performance, or an offer to perform, on the part of the plaintiff, but it is never necessary to prove the perform-

ance of a condition which has been waived or dispensed with by the defendant.   A condition once waived is gone forever, and the performance of it can not thereafter be required. *McPherson* v. *Walker*, 40 Ill. 371.

Mr. George S. House, Mr. George C. Fry, and Mr. James E. Babb, for the appellee:

The refusal of appellee, on April 27, to further perform, did not of itself constitute a breach of the contract.   It gave appellant an election to terminate the contract, or to continue it in force.   Electing the latter, as it did April 29, it kept the contract alive for the defendant, as well as itself, and was bound to show such performance on its part as would have been required if the defendant had never refused to perform. *Johnstone* v. *Milling*, 55 L. J. 162; L. R. 16 Q. B. Div. 470; *McLellan* v. *Winston*, 12 Ontario Rep. 439; *Kadish* v. *Young*, 108 Ill. 170; *Frost* v. *Knight*, L. R. 7, Exch. 78; 1 Moak, 218; 41 L. J. Exch. 78; Blackburn on Law of Contract of Sale, (2d ed. 1887,) 349, 351; *Dingley* v. *Oler*, 117 U. S. 503; *Smoot's case*, 15 Wall. 36; Benjamin on Sales, (4th ed.) sec. 568; *Norrington* v. *Wright*, 115 U. S. 205; *Rolling Mill* v. *Rhodes*, 121 id. 264; *Bingham* v. *Carlisle*, 78 Ala. 247; *Howard* v. *Daly*, 61 N. Y. 374; Anson on Contracts, (2d Am. ed. 1887,) 282.

Appellant failed to show such performance as its election required, in that it had no wire ready for delivery from April 27 till May 24.   *Norrington* v. *Wright*, 115 U. S. 188; *Filley* v. *Pope*, 115 id. 219; *Pope* v. *Porter*, 102 N. Y. 371; *Hime* v. *Klasey*, 9 Bradw. 166.

Mr. Justice Magruder delivered the opinion of the Court:

The court below instructed the jury on behalf of the defendant as follows:   "The court further instructs the jury, that, if they believe from the evidence, the plaintiff and defendant made the contract for wire mentioned in the declaration, that

the plaintiff entered upon the performance of the contract and shipped to the defendant a part of the wire mentioned in the contract, that defendant received and accepted such part, and then notified the plaintiff not 'to ship any more of the wire, then such notice excused the plaintiff from any further performance of the contract, and the plaintiff had no right to proceed further in the performance of the contract, unless such notice should be withdrawn by the defendant," etc.

This instruction is manifestly erroneous. Where one party to a contract gives notice before the time of performance arrives that he does not intend to perform, the other party may treat such notice as a breach and bring his action, or he may decline to accept such notice as a breach, and may insist that the contract shall continue in force up to the time fixed for its final performance, holding the party refusing to perform responsible for the consequences of such refusal. One party to a contract cannot, by simply refusing to carry out his part of it, compel the other party to rescind it. The latter has a right to keep it alive notwithstanding such refusal. This doctrine was clearly announced in *Kadish et al.* v. *Young et al.* 108 Ill. 170.

In the present case, a contract was made between appellant and appellee, by the terms of which the former agreed to sell to the latter 500 tons of fence wire and to deliver the wire so sold between March 7, 1885, and July 1, 1885. When the contract was made, appellant was engaged in shipping wire to appellee, under a former order not yet filled, at the rate of about 20 tons per week. Delivery under the new contract at the same rate was to begin after the completion of the old order. The last wire under the old order was not shipped until March 18, 1885, and deliveries under the new order did not become obligatory upon appellant until a week after that date, to-wit: on March 25, 1885.

When the telegrams, of April 27, directing that shipments be stopped, and of April 29 announcing that the wire would

not be taken if shipped, were received at Trenton, appellant might have treated such telegrams as a breach of the contract, and might have proceeded at once to sue for damages on account of such breach. But appellant also had the right to consider the notice, contained in the telegrams, as inoperative, and to treat the contract as alive and subsisting. Appellant was at liberty to await the time when the contract was to be executed, and to hold appellee responsible for the non-performance of it. Hence the instruction, which announced that "the plaintiff had no right to proceed further in the performance of the contract," etc., was calculated to mislead the jury.

The appellant distinctly refused to stop the shipments of the wire. It thereby elected to continue the agreement in force. It kept the contract alive not only for its own benefit, but also for that of the appellee. It remained liable to all its own obligations and liabilities under the contract. (*Kadish et al.* v. *Young et al. supra.*) It was bound to show, upon the trial, that it was ready, willing and able to perform its part of the contract. For this purpose it introduced testimony tending to prove, that it shipped all the wire, called for by the agreement, to Joliet within the period required for delivery, and there tendered it to the appellee. It is unnecessary to discuss the question, whether such shipments and tenders on the part of the appellant were actually required of it in order to show its readiness and ability to perform its part of the contract, in view of the positive and repeated announcement of the appellee that no more wire would be received after April 27, 1885. Whether or not the appellant was ready, willing and able to perform the agreement, after the notice of April 27 and up to July 1, was a question of fact to be determined by the jury from all the circumstances in the case, including such shipments and tenders.

Counsel for appellee call attention to two facts, which they claim to be undisputed, as showing that appellant failed to establish its willingness and ability to perform the contract.

One is, that appellant shipped no cars between April 21 and May 16, so that none were ready for delivery at Joliet between April 27 and May 24.

The jury had a right to consider the omission of shipments between the dates named in connection with all the circumstances tending to explain such omission. It would have been impossible to ship and deliver 500 tons between March 25 and July 1—a period of about 14 weeks—if only 20 tons could be shipped each week. Three shipments of 20 tons each were made on April 15, 18 and 21 respectively. These 60 tons, all shipped within one week, were accepted by appellee. No objection was made that more than 20 tons were shipped during one week. The only objection ever made by appellee was as to the quality of the wire. The reason given for refusing to receive shipments after April 27, was that the wire was brittle and broke easily, and was of a poor quality.

Again, during the period between April 30 and May 16, it was arranged that appellant's manager should go to Joliet, and examine the wire, and make report as to its quality. It was while this examination was going on for the purpose of determining the justice of appellee's complaints about the wire, that the shipments stopped for a short time. It was for the jury to say whether, under all the circumstances, the failure to ship between April 21 and May 16 showed a want of readiness and ability to perform, or whether appellee waived its right to object to such failure, or impliedly consented to the temporary cessation of shipments in order to settle the question as to the quality of the wire.

The second fact relied on to show a want of readiness and ability to perform, is the alleged non-payment of freight on four carloads of wire when they were tendered to appellee. Appellants made shipments on May 16, 22, 26 and 28, each amounting to 20 tons. The bills of lading were sent to appellee, and returned to appellant with written statements endorsed thereon, that the wire would not be received. Afterwards on

June 10 the amounts of these shipments were tendered to appellee, but the freight on them due to the railroad company was not paid until June 26. There was evidence tending to show, that appellee made no objection because the freight was not paid; that appellant had an arrangement with the R. R. Co. in relation to the payment of the freight, and that, in prior deliveries of wire, appellee had been in the habit of advancing the freight and receiving credit therefor in subsequent settlements for the amounts due on the purchases of the wire. It was for the jury to take all these circumstances into consideration in determining whether the fact, that freight was due on 60 out of the 380 tons tendered after April 27, showed a want of readiness and ability to perform.

Inasmuch as the court instructed the jury, that the plaintiff had no right to proceed further in the performance of the contract after the notice of April 27, the question as to what amounted to a performance or a non-performance was taken from their consideration. It would be entirely immaterial whether the omission to ship wire between April 21 and May 16, and the omission to pay freight on four carloads of wire before they were tendered, did or did not, in the light of all the attending circumstances, amount to a want of readiness and ability to perform, if the plaintiff had no right to perform at all.

The trial court also gave the jury the following instruction for the defendant: "The jury are further instructed that they shall disregard all evidence presented, proving or tending to prove any re-sale of the wire claimed to have been ready for delivery under the contract sued on in this case, all such evidence having been ruled out and excluded by the court." We think this instruction is erroneous, and that the evidence therein referred to should not have been excluded.

Where a vendee of goods, sold at a specific price, refuses to take and pay for the goods, the vendor can resell the goods, and charge the vendee with the difference between the con-

tract price and that realized. at the sale.    The sale must be fair, and must be made in good faith, and in the mode best calculated to produce the real value of the goods.    (*Saladin* v. *Mitchell,* 45 Ill. 79 ; *Ullmann* v. *Kent,* 60 id. 271; *Bagley* v. *Findlay,* 82 id. 524.)

In the present case the sale was made at public auction at Joliet, the place of delivery, and after notice given to appellee. The proof tends to show, that the sale was fairly made with reasonable diligence, judgment and care.    The proof also tends to show, that the price realized at the sale was the fair market value of the wire at the time and place of delivery.

The judgments of the Appellate and Circuit Courts are reversed, and the cause is remanded to the Circuit Court.

*Judgment reversed.*