113  657
d116  140

J. H. HARDWICK *v.* THE AMERICAN CAN COMPANY *et al.*

(*Knoxville.*   September Term, 1904.)

1.  **CONTRACTS.**  To furnish stoves obligates the other party to take them.

A contract between a manufacturer and dealer whereby the manufacturer contracts and agrees to ship to the order of the dealer five thousand or more stoves within one year from its date, at a price fixed or ascertainable, obligates the dealer to take at least five thousand stoves, within the time limited.   (*Post, pp.* 660-662

2.  **SAME.**  Same.  Construed with reference to previous contracts and dealings between the parties.

Such contract is not too indefinite for enforcement where the specifications, sizes, assortments, grades, and quantity of each required are ascertainable from previous contracts and dealings between the same parties, or the manufacturer and the predecessor of the dealer, the last contract with the predecessor being assumed and carried out by the contracting dealer.   (*Post, pp.* 661, 662-672.

Cases cited and approved:   Lumber Co. v. Coal Co., 160 Ill., 85; Wells v. Alexander, 130 N. Y., 642, 646; Parker  v. Pettit,  43 N. Y., 512; Daily v. Clark, 128 Mich., 591; Hicky v. O'Brien, 123 Mich., 611; Carriage Co. v. Steel Co., 104 Fed., 200; Oil Co. v. Lumber Co., 113 Fed., 923.

Cases cited and distinguished:   Hixon v. Hixon, 7 Hum., 33; Miller v. McKinney, 5 Lea, 93; Railroad v. Green, 9 Heis., 588, 593; Kimball v. Dure Wells & Co., 108 Iowa, 676.

3.  **SAME.**  Same.  Same.  Construed from the standpoint, situation, and surroundings of the parties.

It is the duty of the court to ascertain, if it can, the meaning which a contract bears in the minds of the parties, and to enforce that meaning or intention; and for the purpose of discovering the intention the court must view the situation of the

113 Tenn—42

parties and their surroundings, so as to place itself in the position which they occupied, and thus be able to see the things spoken of in the contract as they saw them. (*Post, p.* 670.)

4. **SAME.** Resale and recovery of difference between contract price and amount realized on resale by seller for purchaser's breach of contract, when.

In executory contracts of sale of personalty where the title and possession remain in the seller, as well as in executed contracts of sale where the title has passed to the purchaser, in case of purchaser's breach of the contract before delivery to him, the seller may resell the property, after proper notice to the purchaser, and then maintain a suit against the purchaser for the difference between the contract price and the price realized upon such resale with interest and expenses. (*Post, pp.* 672-674, 677, 681.)

Cases cited and approved: McClure v. Williams, 5 Sneed, 717; Williams v. Godwin, 4 Sneed, 557; Barker v. Reagan 4 Heis., 590; Cole v. Zucarello,, 104 Tenn., 64; Slaughter v. Marlow (Ariz.), 31 Pac., 547; Hide & Leather Co. v. Chalkly (Va., 1903), 44 S. E., 705; Pratt v. Manufacturing Co. (Wis., 1902), 92 N. W., 368; Nelson v. Iron & Rail Co. (Mo.), 77 S. W., 590, 595; Roebling Sons Co. v. Fence Co. (Ill.), 22 N. E., 518; Lumber Co. v. Manufacturing Co., 91 Wis., 667; Gehl v. Produce Co., 105 Wis., 573; Ore Co. v. Guano Co., 109 Ga., 607; Van Brocklen v. Smeallie, 140 N. Y., 70, 75.

Case cited and disapproved: Ironworks v. Iron River Co., 64 Fed., 569.

5. **SAME.** Same. Damages liquidated by resale after suit brought for damages, generally, are not recoverable.

But if the seller seeks to recover the damages liquidated by a resale, he must sue therefor. He cannot sue for damages generally, and by virtue of a resale, made after the filing of the bill, recover such liquidated damages, together with the expenses incurred in effecting such sale. (*Post, p.* 681.)

See citations under headnote 4.

6. **SAME.** Executed contracts passing title and executory contracts not passing title.

Executed contracts of sale of personalty are bargains and sales in which the title to the goods has passed, while executory contracts of sale contemplate that something is to be done to complete the sale, such as weighing, selecting, delivering, or other act, and the title does not pass until there is an appropriation, in the mode agreed upon, of specific goods to the contract. (*Post, pp.* 674-677.)

Cases cited and approved: Potter v. Coward, Meigs, 22; Pulse v. State, 5 Hum., 108, 109; Williams v. Allen, 10 Hum., 338; Shaddon v. Knott, 2 Swan, 362; Broyles v. Lowry, 2 Sneed, 25; Bush v. Barfield, 1 Cold., 93; Bond v. Greenwald, 4 Heis., 463; Barker v. Reagan, 4 Heis., 593; Railroad v. Ford, 11 Heis., 390; Rawls v. Patterson, 1 Bax., 372; Harding v. Metz, 1 Tenn. Chy., 610, 611, 612; Barker v. Freeland, 91 Tenn., 112.

7. **REMANDMENT FOR RETRIAL.** Upon reversal of chancery decree based upon wrong principles of law under reference to the master.

Where the seller of personalty sues to recover damages from the purchaser for his breach of the contract, and the chancellor decrees that complainant is entitled to recover the difference between the contract price and that realized under a resale made after the institution of that suit, and refers the cause to the master on this basis, and renders a decree based upon a report made by the master pursuant to the terms of the decree of reference, the supreme court will reverse the decree for this error, and will remand the cause for a retrial, with leave to the complainant to take a reference under the bill, to ascertain the damages to be measured by the difference between the contract price and the price at the time and place of delivery. (*Post, pp.* 673,682.)

FROM HAMILTON.

Appeal from the Chancery Court of Hamilton County. —T. M. McCONNELL, Chancellor.

BROWN & SPURLOCK and PRITCHARD & SIZER, for complainant.

WHEELER & TRIMBLE and WHITE & MARTIN, for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

The complainant, trading under the name of "The Cleveland Stove Works," entered into the following contract with the defendant company, viz.:

"The Cleveland Stove Works, of Cleveland, Tennessee, contracts and agrees to ship to the order of the American Can Company, of Atlanta, Georgia, five thousand or more stoves, which are to be shipped within one year from date." There were other provisions not necessary to set forth here, but which, so far as may be required, will be stated later, in their appropriate place.

The bill in the present case was filed to recover damages for the breach of this contract. It alleged that the complainant had manufactured the five thousand stoves, and had tendered them to the defendant, but that

the latter had taken only eleven hundred and ninety-one, declining to receive the remaining stoves.

The defenses, so far as necessary to be here stated, were that the defendant was not bound to order any of the stoves at all, that under the contract, it had the option to take the whole number named, or any less number, or none; secondly, that the contract was too indefinite for enforcement.

The damages claimed in the bill were laid at $15,000. The case was tried before the chancellor, and resulted in a judgment in favor of the complainant for the sum of $5,500. When the case reached this court on appeal, it was referred to the court of chancery appeals. That court added two items, amounting to something over $100 to the recovery, and affirmed the decree of the chancellor. From the decree of the court of chancery appeals an appeal has been prayed and prosecuted to this court, and errors have been assigned here.

The first error assigned makes the point that the court of chancery appeals erred in refusing to sanction the first defense above set out.

There was no error in the matter complained of. The contract, in portions which we have not quoted, fixed the price of the stoves, or a means of ascertaining the price. The wording of the instrument which we have quoted is peculiar, it is true, in that the obligation is, in terms, only upon the complainant "to ship to the order of" the defendant so many stoves; but we think that no other conclusion can be reached than that the

complainant was to furnish and the defendant was to receive at least five thousand stoves, within the time limited, one year from the date of the contract. The obligation of the complainant to furnish must in sound reason find its correlative in a corresponding obligation on the part of the defendant to receive.

In order to a proper understanding of the second defense, it is necessary that we should state the facts found in respect thereof by the court of chancery appeals.

That court finds that the defendant, American Can Company, had purchased the plant and business of the "Conklin Factory," located at Atlanta, Georgia, and continued the business of the latter concern at the same place; that for ten years prior to the date at which the "Conklin Factory" was purchased by the defendant, the complainant had been selling stoves to the "Conklin Factory," and had had several contracts with that organization, each for five thousand stoves, the last of which was made on August 3, 1900, and was in force when the "Conklin Factory" was purchased by the defendant company, and that the latter assumed and carried out this contract, the complainant furnishing thereunder five thousand stoves or more; that after the making of the contract last mentioned, complainant proceeded with the work of making stoves of different kinds, such as he thought would be suitable to the trade, and of such patterns as he had previously sold to the "Conklin Factory."

The court of chancery appeals further finds that at the expiration of the contract last referred to, complainant addressed a letter to the defendant inclosing the draft of a new contract, and on June 19, 1901, he again wrote asking a return of the paper as soon as possible, assigning as a reason for the request that he wished to be prepared with an adequate amount of iron for the making of the stoves; that after a number of letters had passed, the defendant, through its proper officer, said it was willing to make the contract as soon as they could agree upon the price of No. 2 pig iron (which regulated the price of the stoves); that after an agreement had been reached upon this subject the writing was executed and returned to the complainant.

It is further found that after the execution of the writing, complainant proceeded to manufacture stoves of about twenty different sizes and kinds, as embraced in the contract; that defendant gave no specifications as to the kind it wished, and therefore complainant took the sales he had previously made to the "Conklin Factory," for previous years, and made an estimate for the existing contract, on a basis of the average taken in such previous years; "that complainant acted upon this theory, and adopted this method for ascertaining what assortment defendant would have ordered had it complied with the contract, that is, had the defendant taken the assortment ordered by it" (or its predecessor), "for previous periods, and under prior contracts, thereby assuming that the same assortment would be required under

the present contract, inasmuch as the defendant was
supplying the same territory covered by previous con-
tracts." . . . "That defendant was to order and take
from complainant all the stoves necessary to supply, for
the term agreed upon, the trade of the Conklin Factory,
the defendant expressly stipulating that it would not
handle, buy, or sell, the stoves of any other manufac-
turer during the existence of the contract; that taking
one year with another, a dealer will sell practically the
same assortment of sizes each year, and that where a
manufacturer has supplied a wholesale dealer for a
number of years, he would become familiar with the
assortment the purchaser would require, and that the
number of stoves would be taken in assorted sizes;" that
the defendant was to take its entire requirement of
stoves from complainant during the time stated in the
contract, and "in such an assortment as to sizes and
kinds as defendant needed to supply its trade;" that the
parties themselves, by their conduct and correspondence
construed the contract as requiring the defendant
to order and receive at least five thousand stoves, during
the time fixed in the contract, and that complainant was
bound to ship that number to defendant's order within
the year; that both parties to the contract so understood
it.

In addition to the foregoing findings, we shall now set
out certain clauses of the written contract sued upon
not previously copied. They are as follows:

"In consideration of the agreement or contract of the

Cleveland Stove Works, as aforesaid, the said Conklin Factory, of the American Can Company, agrees and binds itself not to handle, buy or sell, or offer to buy or sell, stoves from any manufacturer, jobber, commission man, or broker, from and after this date, for a period of one year, unless and provided, the Cleveland Stove Works are unable to fill the orders of the Conklin Factory of the American Can Company, with a reasonable degree of promptness, and in that event, reasonable concessions will be made as to the quantity to be taken . . . and said Cleveland Stove Works in consideration of the agreement of the Conklin Factory of the American Can Company agrees not to sell stoves in the State of Georgia to any other party or parties, unless the sale is made with the permission and full consent of the Conklin Factory of the American Can Company, within a period of twelve months from date."

It will be perceived, from the designation of the contracting parties in the foregoing excerpt, that the defendant company identifies itself with the "Conklin Factory," treating itself as a continuation of that concern, in respect of the business to be transacted, although the contract was signed and executed in the name of the "American Can Company."

The question arising on the foregoing facts, is whether the contract is sufficiently definite for enforcement.

The following authorities will shed light upon the inquiry:

It has been held that a contract to supply the require-

ments of a party during a fixed period does not mean simply so much of the article mentioned as he may choose to take, but so much as his business may need and require. Thus it was held that a contract by a lumber company for its requirements of coal for a certain season was not void for uncertainty and want of mutuality, when it was meant to call for the amount of coal which the corporation should need in its business for the season, not merely what it might choose to require. The court said that when a contract is susceptible of two constructions, that one should be adopted which will give operation to it, rather than one which will render it inoperative; also that a contract should be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such construction is wholly negatived by the language used. *Minnesota Lumber Co. v. Coal Co.,* 160 Ill., 85, 31 L. R. A., 529.

In *Wells v. Alexander,* 130 N. Y., 642, the plaintiff made a proposition by letter to *"furnish"* certain steamers owned by defendant with coal for the year 1888, at a stipulated price, which offer defendant accepted by letter. Thereafter, and until about the middle of the year, plaintiff did furnish defendant all of the coal required for the use of the steamers named, and then the defendant sold the steamers, and ordered no more coal, whereupon the plaintiff sued for damages for breach of the contract. It was held that the contract bound plaintiff to furnish, and defendant to order, and pay for,

all the coal which would be required by the steamers
mentioned during the year covered by the contract; and
while the amount was not fixed, and could not have been
at the time the agreement was made, yet it was ascer-
tainable by its terms, and therefore certain within the
maxim, *id certum est quod certum reddi potest.* S. C.,
15 L. R. A., 218. It as also said in this case that the
fact that the defendant deemed it best to sell the
steamers could not be permitted to relieve him of the
obligation to take the coal which the ordinary and
accustomed use of the ships required; that the provis-
ions of the agreement did not admit of a construction
that it was to terminate in the event of a sale or other
disposition of the ships by the defendant. 130 N. Y.,
646.

A contract between a manufacturer of pig iron and
one engaged in a business requiring the use of pig iron,
"that the former will supply to the latter, and the latter
will purchase from him, all the pig iron which he will
need, use, or consume, in his business," for a fixed
period, was held valid and binding, and required the
purchaser, the appellee, to take "such a quantity of pig
iron in view of the situation and business of appellee as
was reasonably required and necessary in its manufac-
turing business." *Nat. Fur. Co.* v. *Keystone Mfg. Co.,*
110 Ill., 427.

A contract by one person to sell another "all the straw
he has to spare, not exceeding three tons," was held
valid and binding, and it was held that the quantity

could be shown by parol evidence. *Parker* v. *Pettit,* 43 N. J. Law, 512.

And a contract to furnish a canning factory "all the cans they will use for packing in their factory," during a certain period, is valid and binding. *E. G. Daily Co.* v. *Clark Co.,* 128 Mich., 591.

So, in a contract to buy, "all the ice necessary" to carry on the purchaser's business during a stipulated period, the quantity "is measured by the necessities of the business, which is presumed to continue for the time agreed on." *Hicky* v. *O'Brien,* 123 Mich., 611, 49 L. R. A., 594.

A contract to furnish "all the tire steel · . . . which will be used in the buyer's works" within a fixed period, not to exceed fourteen thousand sets, not to be less than ten thousand sets, binds the purchaser to take and the seller to furnish "the quantity reasonably required for use in the buyer's works up to the date named, within the amounts specified." *Staver Carriage Co.* v. *Park Steel Co.,* 104 Fed., 200.

A contract whereby one party agrees to sell, and the other to buy, all the oil which the purchasers "may require for their own use for a period of twelve months," was held valid and binding on both parties, it appearing that the purchasers owned a manufacturing plant at which oil was used, and parol evidence being admitted to show "its daily capacity for the consumption of such oil as was ordered." The written contract covered three different grades of oil at as many different prices,

neither the total quantity nor the proportions of the different grades being specified; but the court held that when the contract was "read in the light of the previous business relations of the parties," it was plain that it meant that the purchaser "should buy what oil it should require for its use in its manufacturing business." *Manhattan Oil Co.* v. *Richardson Lumber Co.*, 113 Fed., 923.

The substance of the complainant's contention is that when the parties made the contract they had in mind some standard by which their conduct thereunder was to be regulated; and that that standard must be found in the previous relations existing between the complainant and the defendant's immediate predecessor which it had incorporated into itself, and with the defendant itself in its assumption and executing of the last preceding contract with such predecessor. It was known, of course, and figured in the calculations of the parties, that the complainant was manufacturing twenty different kinds of stoves, that he had patterns therefor, and that his business was of the character thus indicated. It was known also that the defendant was buying to supply a special character of trade, and that the stove business was uniform, in that one year with another the same trade would take about the same assortment of grades and sizes. Hence, it is seen that the character, kind, and quality, in short, the assortment of stoves covered by the contract, all lay within reasonable limits, and could be ascertained with reasonable certainty. It cannot be doubted that, in the

ordinary course of business, in respect to which men generally make their calculations, if the defendant had carried out its contract and ordered the five thousand stoves, it would have ordered substantially the same kinds of stoves which were used to supply the same trade under previous contracts with the "Conklin Factory," as it anticipated doing when the contract was entered into. Equally, there can be no doubt, under the facts found by the court of chancery appeals, that the defendant's failure to carry out the contract by ordering the five thousand stoves, resulted from its determination, pending the running of the contract, to drop a certain class of its customers which it had previously supplied, viz: retail dealers; having dropped these, it then desired to escape from the contract, and is now using the element of apparent uncertainty supposed to reside in the contract, to elude the obligation to faithfully carry it out. It is the duty of the court, however, to ascertain, if it can, the meaning which the contract bore in the minds of the parties, and to enforce that meaning or intention. For the purpose of discovering this intention, we must view the situation of the parties and their surroundings so as to place ourselves in the position which they occupied, and thus be able to see the things spoken of in the contract as they saw them. Taking this point of view, with the aid of the facts found by the court of chancery appeals, we think it clear that the meaning of the contract is as above indicated, and that this enables us to attain substantial certainty.

As opposing the conclusion thus reached, we are referred by defendant's counsel, especially, to the case of *Kimball Bros.* v. *Dure Wells & Co.*, 108 Iowa, 676. That case, however, is not parallel in its facts, nor does it cover the present case in principle. In that case, it is true, the plaintiffs agreed to furnish the defendants certain scales known as "Columbia Scales" made from patterns then in use by the Columbia Scale Company, which the defendant was to sell in a certain territory named; and it is also true that there were several different kinds of scales of the particular make referred to, selling for different prices, and the contract did not specify what special kinds of scales the defendants were to take. After ordering a number of scales the defendants refused to take any more. Thereupon, the plaintiffs sued for damages. The contract was for one hundred and fifty sets of scales. The court held that the plaintiffs were entitled to recover damages for so many sets of scales as the defendants had refused to take less than the contract number, but that they would only be liable for the cheapest kind of scales, on the theory that the choice, or selection, lay with the defendants. One important element, however, that appears in the present case, did not appear in the case referred to; that is, the previous history of the dealings of the parties, furnishing a basis for ascertaining the assortment of goods which they had in mind.

We are also referred to the case of *Hixon* v. *Hixon,* 7 Hum., 33, wherein it appeared that a defendant had

contracted to pay a debt either in Tennessee, Alabama, or Georgia money, and it was held that he had the right to settle in the cheapest money. To the same effect, *Miller* v. *McKinney*, 5 Lea, 93, and *Miss. & Tenn. R. R. Co.* v. *Green,* 9 Heisk., 588, 593.

These cases, and others of the same kind, cited in the brief of defendant's counsel, are distinguishable on the ground already stated; the vital difference between the cases referred to by defendant's counsel and the case before the court, being found in the fact that in the latter the parties in dealing with each other had reference to former dealings between them, and so mutually understanding each other, contracted with reference thereto, and intended that substantially the same course of conduct should be pursued between them.

On the grounds stated, we are of opinion that the second defense is not well made, and that the chancellor acted correctly in directing a reference on the basis of such former dealings between the complainants and the defendant and its predecessor.

The next point for consideration arises in the following manner.

On the 3d of August, 1902, after the breach of the contract, the complainant gave notice to the defendant that he would sell the goods on the 25th of the same month, unless the defendant should come forward and comply with the terms of its contract. The goods were not sold on the day fixed in the notice, nor at any other time before the filing of the bill, but afterwards, in fact

a considerable time after the bill had been filed.   The
bill was filed on the first day of September, 1902, to
recover damages generally, for the failure of the de-
fendant to take the goods, and hence really for the dif-
ference between the contract price and the market value
at the time and place of delivery.   It did not seek to
recover the difference between the contract price, and
the price realized upon the resale, and did not seek to re-
cover the expenses of such resale, and, indeed, could not
have done so, because, as stated, the resale took place
after the bill was filed.   Yet the chancellor decreed,
"that complainant is entitled to recover the deficiency,
if any, between the price realized for said stoves under
such resale, and the price which complainant would
have received from them under the contract, if said
stoves had been taken and paid for by defendant in
accordance with the terms of the contract, and in addi-
tion thereto the reasonable and necessary expense to
complainant of reselling said stoves, and of caring for
them and keeping them in salable condition until they
were sold;" and he directed a reference to the master on
this basis, and the decree in favor of the complainant,
before referred to, was based upon a report made by the
master pursuant to the terms of the decree above stated.
The court of chancery appeals affirmed this action of
the chancellor.   The question now to be determined is
whether this action was correct.

In order to a more satisfactory disposition of the mat-
113 Tenn—43

ter, we shall consider the law applicable to both executed and executory contracts of sale, in respect of the vendor's right of resale upon the purchaser's refusal to take the goods.

Before proceeding further, we pause to state the meaning which we attach to the terms "executed" and "executory" as applied to contracts of sale.

As pointed out by Mechem in his work on Sales, there is in the authorities a want of precision in the use of the term "sale." "It seems impossible," says this author, "for courts and text-writers to agree either as to the meaning of the word or as to the essential elements of the idea which it represents. According to some, the sale is the *transfer* of the title; according to others, it is the *agreement* to transfer. In the case of the agreement for the present transfer, where the law executes the agreement by deeming the title as transferred accordingly, it can be matter of small moment whether the word be applied to the agreement or to the transfer, because the making of the former operates at once to effectuate the latter; but where time, or the performance of conditions, is to intervene between the agreement and the transfer, it is necessary to have appropriate words to indicate these two ideas. It is indeed true, here, that the effectual thing upon which the law operates to produce the transfer is still the agreement of the parties; but before the law so operates the agreement of the parties requires to be aided, supplemented, or completed, by the lapse of time, or the performance of

conditions precedent, and during this interval the attitude, or relation, of the parties, needs often to be definitely determined. . . . The common law clearly recognized these two forms and applied to each a well-known name. Thus, if by the terms of the agreement the property in the thing sold passed immediately to the buyer, the contract was termed in the common law, 'a bargain and sale of goods;' but if the property in the goods was to remain for the time being in the seller, and only to pass to the buyer at a future time, or on the accomplishment of certain conditions, as for example, it was necessary to weigh, or measure what was sold out of the bulk belonging to the vendor, then the contract was called in the common law, an executory agreement. The attempt to distinguish these forms has frequently been made by applying the term 'executed sale,' to the former, and 'executory sale' to the latter; but this attempt has not proved entirely satisfactory, not only because the terms have not always been used in the same sense, but because the so-called 'executed sale' may be executed in part only; that is, so far as to pass the title while it remains executory in part, as where delivery or payment is postponed. Idem, secs. 5 and 6.

The common law nomenclature was adopted in our case of *Harding* v. *Metz,* and the distinction noted between the two classes of contracts in the following language: "If parties agree upon the terms of sale of personalty, and annex no condition to the contract, the property passes to the buyer without delivery, or tender

of price. *Potter* v. *Coward,* Meigs, 22; Benj. on Sales, 218. This is a bargain and sale as distinguished from an executory agreement. Benj. on Sales, 213. The latter contemplates that something is to be done to complete the sale, such as weighing, selecting, delivering, or other act, and is converted into a bargain and sale by the appropriation, in the mode agreed upon, of specific goods to the contract. Id., 217. In either case, as soon as the specific goods sold are ascertained, either by the original contract or subsequent appropriation, the property vests in the buyer without payment, if no condition be annexed to the contract." 1 Tenn. Chy., 610, 611, 612.

So soon as the vendee says, "I will pay the price demanded," and the vendor says, "I will receive it," the vendee has the right to demand the thing sold, and the vendor the consideration; they are mutually entitled, the one to his action for the thing, and the other to his action for the price. *Potter* v. *Coward,* supra; *Pulse* v. *State,* 5 Hum., 108, 109; *Rawls* v. *Patterson,* 1 Bax., 372; *Bond* v. *Greenwald,* 4 Heisk., 463; *Shaddon* v. *Knott,* 2 Swan, 362; *Broyles* v. *Lowry,* 2 Sneed, 25; *Bush* v. *Barfield,* 1 Cold., 93; *Williams* v. *Allen,* 10 Hum., 338; *Barker* v. *Reagan,* 4 Heisk., 593. When the contract is complete according to the agreement of the parties, leaving nothing further to be done by either, then the title passes, although there is no formal delivery or payment of the money. *R. R. Co.* v. *Ford,* 11 Heisk., 390; *Barker* v. *Freeland,* 91 Tenn., 112. But this rule will prevail only in the absence of a contrary

stipulation.   The parties may annex any qualification to the general terms of the contract that they may agree upon, and the title will not pass when it appears from the contract that the parties interested in it intended it should not.   Id.

In the use of the expression "executed contracts of sale" herein, we mean those in which the title to the goods has passed; by the expression, "executory contracts of sale," we indicate those in which the title has not passed.

Under the former the property belongs to the vendee, and the vendor in making the resale sells, as his agent. If the resale has been properly made, that is, fairly, and after reasonable notice, and with proper diligence, it fixes absolutely the amount due from the vendee to the vendor, that is, the difference between the contract price and the price realized upon such resale, and the action is for that sum with interest, and with expenses added.   *McClure & Crozier* v. *Williams,* 5 Sneed, 717; *Williams* v. *Godwin,* 4 Sneed, 557; *Barker* v. *Reagan,* 4 Heisk., 590; *Slaughter* v. *Marlow* (Ariz.), 31 Pac. Rep., 547; 2 Mechem on Sales, sec. 1643.

Does a different rule apply in the case of executory contracts of sale?   Defendant's counsel insist that there is a different rule for this class of cases, and cite in support of their contention the case of *Cherry Valley Iron Works* v. *Florence Iron River Co.,* 64 Fed Rep., 569.   The case is in point; but a careful examination of the question has convinced us that the weight of au-

thority, in this country, is the other way. *American Hide & Leather Co.* v. *Chalkly & Co.* (Va., 1903), 44 S. E., 705; *Pratt* v. *Freeman & Sons Mfg. Co.* (Wis., 1902), 92 N. W., 368; *Nelson* v. *Cal. Hirsch & Sons Iron & Rail Co.* (Mo.), 77 S. W., 590, 595; *John A. Roebling Sons Co.* v. *Lockstitch Fence Co.* (Ill.), 22 N. E., 518; *Cole* v. *Zucarello,* 104 Tenn., 64; 2 Mechem on Sales, secs. 1645-1649, 1689, 1690, 1692; 24 Am. & Eng. Ency. of Law (2d Ed.), 1139, 1140.

In *American Hide & Leather Co.* v. *Chalkly & Co.,* supra, it is said: "The doctrine is that where a contract of sale is executory, and the title and possession still remain in the seller, his remedy against the buyer who wrongfully refuses to accept and pay for the goods, is an action of assumpsit on a special count to recover damages for the breach of the contract.

"It is said that the seller cannot maintain an action for the agreed price, as he could do if the title had passed, but must sue for indemnity for the loss of his bargain; the quantum of damages which he has sustained, and the measure of his recovery being the difference between the contract price of the goods and the net price which they produce at a resale, fairly made, after deducting all expenses incurred by the seller, in taking care of the goods and selling them.

"In such case the seller should give the buyer notice that he intends to sell, and hold him responsible for the loss. This notice, is will be observed, is not a notice of

resale, but a notice that the seller will assert his right of resale, and bind the buyer by the price obtained.

"In the case in judgment the property in the goods had not passed. The contracts were for the sale of non-specific hides, being an agreement merely to sell hides of a particular description. But the specific hides upon which the contracts were to operate had not been agreed upon, and the rule in such case is that the property in the goods does not pass until an appropriation of the specific goods has been made with the assent of both seller and buyer. Benj. Prin. of Sales, rule 23, p. 81.

"In the case at bar plaintiff notified the defendant that he would sell the hides at his risk, unless received."

In that case the defendant below was held liable for the expense of sale, or, the same thing, credited with the proceeds of sale, less the expense.

In *Pratt* v. *Freeman & Sons Mfg. Co.*, supra, it is said: "Immediately upon the vendee's refusing or neglecting, when required to do so, to comply with the sale contract by paying for the property and so accepting delivery thereof, the cause of action of the vendor becomes complete, and his right to enforce the same by such appropriate remedies, as he may elect to pursue, perfect. If he chooses to liquidate his damages by a sale of the property, and incidentally to recover his loss so far as the proceeds of sale will effect that result, failure to give notice of the intention to sell the property, and failure to do that which is reasonably necessary to

secure the best price obtainable therefor, does not give the vendee any right to rescind his contract, but renders the result of the sale not binding on him as to the amount of the vendor's loss by the former's breach, and he will remain liable to the latter for the full market value of the property less his actual damages, independently of the sale. The sale, in such circumstances, is but a method, as before indicated, of enforcing a right to damages for breach of contract, one of making evidence of the precise amount of such damages. The sale, when properly conducted, the executory vendee having been so notified of the intention to make it as to give him reasonable opportunity to prevent it by paying his debt, constitutes a basis binding on him, for computing the damages for which he is liable. The rule governing the subject was laid down in *T. B. Scott Lumber Co.* v. *Hafner Lothman Mfg. Co.,* 91 Wis., 667, 65 N. W., 513, in these words:

"If a resale is made, and the evidence shows that all reasonable efforts were made to secure the best price obtainable, or that the price obtained was a fair one, it settles the question of the market value, so that the damages become liquidated.

"The idea is that when the executory vendee of property breaks his agreement to take and pay for the property, the measure of damages is the difference between the market value thereof, and the contract price; but the vendor must necessarily establish that as a basis for his claims. If he sues for his damages without selling the

property, or without selling the same with proper regard to the rights of the executory vendee, he takes upon himself the burden of establishing the fair market value of the goods at the time of the breach. So, it is said, that notice to the vendee of the vendor's intention to make the sale, and the sale, with proper regard to the interests of the former, merely creates definite and conclusive evidence of such market value. *T. B. Scott Lumber Co.* v. *Hafner Lothman Mfg. Co.*, supra; *Gehl* v. *Produce Co.*, 105 Wis., 573, 81 N. W., 666; *Davis Sulphur Ore Co.* v. *Atlanta Guano Co.*, 109 Ga., 607, 34 S. E., 1011; Mechem on Sales, 1649, 1650."

It is a sound deduction from the foregoing principles that if the complainant seeks to recover the damages liquidated by a resale, he must sue therefor. He cannot sue for damages generally, and, by virtue, of a resale made after the filing of the bill, recover such liquidated damages together with the expenses incurred in effecting such sale. When the damages have been so liquidated, the right of action is to recover those damages, and the expenses incurred in effecting the liquidation. If the sale has been properly made it is binding on the vendee, and also binding on the vendor. He has elected to adopt that remedy out of the three (*Cole* v. *Zucarello,* supra; *Van Brocklen* v. *Smeallie,* 140 N. Y., 70, 75), which the law allows to him. We do not say that if a vendor has made an ineffectual sale, one not binding on the vendee by reason of the absence of a proper notice upon the subject, or the existence of some other defect,

Hardwick v. Can Co.

he could not sue for and recover his damages on showing the market value at the time and place of delivery, by other evidence, and so furnishing a basis for ascertaining the difference between such market value and the contract price. What we do hold is that if he base his right to recover as to amount, upon a resale, such resale must be made before the filing of the bill.

From the foregoing discussion, it is apparent that the chancellor and the court of chancery appeals were in error in rendering a decree in favor of the complainant on the basis of the resale made after the filing of the bill.

For this error the decree will be reversed and the cause remanded for a retrial, with leave to the complainant to take a reference under the bill as at present framed, to ascertain the damages sustained by the complainant by the breach of the contract on the part of the defendant, the measure of which damages will be the difference between the contract price and the price at the time and place of delivery. On this reference the testimony taken concerning the price realized upon resale, where otherwise competent, may be read for what it may be worth towards showing the market price at the time and place of delivery, but not as conclusive on said question.

Other points made in the briefs of counsel are considered and disposed of in a memorandum opinion filed with the record, but they need not be adverted to here.

Let a decree be entered as above indicated. The complainant will pay the costs of the appeal.