## ELBERTON HARDWARE·COMPANY *v.* HAWES.

1. Where the parties to an executory agreement for the sale of goods agree that the price to be paid for the property shall be fixed by valuers nominated in the agreement, there is no contract of sale if the persons appointed as valuers fail or refuse to act as such ; and this is true even where one of the parties to the agreement is the cause of such failure or refusal.
2. Where one of the persons nominated in such an agreement as valuers refuses to act, the other has no power, without the consent of both parties to the agreement, to select a third person to act as a valuer in the place of the person so refusing.
3. The consent of one of the parties to such an agreement that another valuer should be so selected can not be implied from his mere failure to reply to a written notice by the other party of the refusal of one of the valuers nominated to act, and that if the party notified did not select another person to fill the place, the valuer willing to act would select a third person to serve with him in valuing the property.
4. The fact that one of the parties to an agreement of this character is the cause of the refusal of one of the persons appointed therein as a valuer to act as such does not estop him from denying that he is bound by a valuation of the property made otherwise than as provided for in the agreement.

Argued April 13,—Decided May 12, 1905.

Action for breach of contract. Before Judge Holden. Elbert superior court. October 17, 1904.

In a suit by the Elberton Hardware Company against A. S. Hawes, the petition made the following allegations: The plaintiff is a corporation. On February 20, 1904, the parties entered into the following written contract: "State of Georgia, County of Elbert. This contract and agreement made and entered into this 20th day of February, 1904, by and between the Elberton Hardware Company, a corporation duly organized under the laws of said State, of the first part, and A. S. Hawes of said State and county, witnesseth: That the said The Elberton Hardware Company has sold to the said Hawes the entire stock of goods now owned by said company in the city of Elberton or in transit pur-

chased by said company.    The price to be paid for all goods now in Elberton shall be the cost and carriage of said goods, less 2%. The expression 'cost and carriage' herein used is agreed to mean first cost and freight.    On all goods now ordered and in transit the said Hawes is to take the place and stead of said company, pay for said goods the same prices the said company has agreed to pay.    The said company shall countermand all orders in its power to countermand which the said Hawes shall elect in writing to be countermanded.  . The stock of goods on hand of said company shall be taken under the direct supervision of H. M. Owsley and J. T. Whiteside.    All depreciated stock up to two hundred dollars to be paid for as set forth in paragraph two of this contract, and a fair valuation of all depreciated stock in excess of two hundred dollars shall be determined by the said Owsley and Whiteside.    In case they should fail to agree as to the value of any such depreciated stock, they shall select a referee whose decision shall be binding on all parties herein as regards such valuation.    As long as the said Hawes shall rent from N. G. Long the store and warehouse now occupied by said company, neither N. G. Long nor Geo. E. Heard, the said Long and Heard being the sole stockholders in said The Elberton Hardware Co., shall engage in or own stock in any hardware business in the city of Elberton.    The said Hawes is to pay said company the sum of six thousand dollars in cash as soon as said stock of goods is taken and valued by said Owsley and Whiteside, and shall give to said company a note for the balance of the value of said goods, bearing eight per cent. interest from date thereof, with the usual clause therein regarding 10% attorney's fees, and waiver of homestead and exemption right under seal.    The said Hawes further agrees to form a corporation which shall take charge of and manage said hardware business, which said corporation shall give its note indorsed by said Hawes, in lieu of the note just above mentioned.    Upon the making of the said last-mentioned note the individual note of said A. S. Hawes shall be surrendered to said Hawes by said company.    Said stock-taking shall commence February 29th, 1904, and be completed as early as possible.    This sale to be complete and the said six thousand dollars due the day said stock-taking is finished.    All notes, mortgage liens, and accounts of any nature whatever due said The Elberton Hardware

Company are to be held by said company, and all debts due others by said company are to be paid by said The Elberton Hardware Company. The title to the stock of goods hereinbefore mentioned is to remain in said The Elberton Hardware Company and remain its absolute property until the payment of the sum of six thousand dollars by the said Hawes as hereinbefore specified. In witness whereof the parties to this agreement have hereunto set their hands and seals the day and year first above written. Executed in duplicate.

Witness:        The Elberton Hardware Company (L. S.)

Sam L. Olive,      By N. G. Long, President,

W. D. Tutt Jr.      A. S. Hawes (L. S.)"

On March 2, 1904, Owsley and Whiteside "began taking the stock in accordance with the terms of said contract." On March 5 thereafter "Owsley refused to have anything further to do with said stock-taking." On that day the plaintiff notified the defendant in writing that it was "ready and waiting for [him] to come and take stock under [the] contract of February 20th, 1904." Two days later the plaintiff sent the defendant a letter, notifying him that Owsley refused "to further assist in or supervise the stock-taking of the goods recently purchased by [defendant] from the Elberton Hardware Company," and that "Whiteside, the other man mentioned in the contract, [was] ready and willing to proceed with said stock-taking," requesting the defendant to select a man to take Owsley's place in the matter, and informing him that, in case he refused to do so, the plaintiff would "at once proceed to have said stock taken under the supervision of said Whiteside and such other man as he [might] select." On March 11, 1904, the plaintiff again wrote to the defendant, calling his attention to the above-mentioned letter, the notice therein of Owsley's refusal to act, and its request that the defendant should select some one to take his place, stating that it had received no reply to this letter, renewing its request that the defendant should select some one to take Owsley's place, and requesting an early reply. Five days after this the plaintiff wrote to the defendant, calling his attention to its letters of the 7th and 11th of March, stating that it had received no reply to the same, and that Whiteside had "selected Geo. A. Gaines to assist him in taking said stock of goods, and they [had] taken said stock fully and fairly;" that "their in-

ventory, taken under the terms of [the] contract" between the
parties, showed the value of the stock to be $16,602.81, of which
amount $198.39 was in depreciated stock, and the remainder in un-
depreciated stock, and that the value mentioned was the net value
after deducting two per cent. and giving a fair valuation to depre-
ciated stock.　This letter stated that the full stock-taking and
inventory had been completed that day, and that the plaintiff ten-
dered the stock of goods to the defendant and demanded that he
pay it the sum of $6,000 and give to it his note for the remaining
sum of $10,602.81, payable within a reasonable date, and bearing
eight per cent. per annum interest.　The letter further stated that
the plaintiff was prepared to give the defendant title to the stock,
and a bond guaranteeing the title, upon his compliance with the
demands made, and that the plaintiff expected an answer on that
day.　On the next day, the plaintiff wrote to the defendant, call-
ing his attention to its letter of the day before, and notifying him
that it would open the store that day and, in due course of retail
trade, sell such goods as purchasers might wish at retail prices
until the 9th of April, 1904, when it would expose the remaining
stock for sale at public auction, in front of the court-house door,
in Elberton, Ga., at eleven o'clock, a. m., and would add the pro-
ceeds of the retail sales and the proceeds of the auction sale
together, and, if the total amount should be less than $16.602.81,
would hold him responsible for the difference, but if the total pro-
ceeds amounted to more than said sum the plaintiff would pay
the defendant the difference.　This letter further stated that the
plaintiff would advertise the auction in two named Elberton news-
papers for four issues just preceding the 9th of April, 1904, and
would also advertise the retail sales and do everything it could to
protect the defendant's interest, and that he could "have posses-
sion and title to said stock of goods at any time before said auc-
tion by complying with the terms of [plaintiff's] letter" of the
day before.　On the 19th of August, 1904, the plaintiff wrote to
the defendant, notifying him that the sale in front of the court-
house, on April 9, 1904, resulted in the stock of goods being sold
to the highest bidder for the sum of $7,500 ; that the retail sales
prior to that time amounted to $1,380.69, making the total
amount received from the sales of the stock of goods $8,880.69,
and demanding of him $7,722.12, the difference between the

amount realized from the sales of the stock and the sum at which it was inventoried and valued, "in compliance with the terms of the original contract of sale and [the] letters" of the plaintiff to him upon the subject. In this letter the plaintiff also demanded of the defendant $242.80 as expenses incurred in the sale of the stock, consisting of stated amounts for clerk hire, rent of store, insurance, etc. It also demanded of him interest on the sums demanded, from April 9, 1904, at the rate of seven per cent. per annum.

The petition alleged the selection of Gaines by Whiteside to assist in taking the stock and making an inventory of the same; that "this was not done till said Hawes refused to notice the letters" of the plaintiff upon the subject; that Whiteside, assisted by Gaines, made an inventory of the stock, "following the terms of the contract;" that the store was closed and no sales made while the stock was being taken; that the price of the stock was ascertained by them to be $16,602.81, "they following strictly the terms of the contract," "that the stock-taking and inventory were completed on March 16, 1904; that on March 17, 1904, after sending the defendant the letter of that date, the plaintiff opened the doors of the store and began to sell the goods at retail prices, the amount realized from the retail sales being $1,380.69; that the expenses in making the sales were $236.80, consisting of stated items for clerk hire, etc.; that the plaintiff advertised the auction of the goods in the two Elberton newspapers, for four issues just preceding the 9th of April, the cost of such advertising being $6, and on the date mentioned the remaining stock was sold, at public sale, in front of the court-house door in Elberton, to the highest bidder for $7,500 ; that Hawes, the defendant, was present at the sale and offered no objection thereto. In the 15th paragraph of the petition it was alleged that while Owsley and Whiteside were taking the stock, before Owsley refused to further participate therein, the defendant directed a salesman in the store to sell from the stock of goods one wheelbarrow for $2, and that the salesman did so and gave the money received from such sale to the defendant, which sum the defendant took and still retained. The 21st paragraph alleged that under the facts set forth in the petition, the defendant "has injured and damaged petitioner in the sum of $7,722.12 by the failure

of the said Hawes to comply with the terms of the contract . . set forth . .; that the said Hawes by his failure to comply with his covenants, after every reasonable opportunity had been afforded him to comply with the same, has caused a breach by him of said contract and he is liable to petitioner for the difference between the purchase-price of said stock, to wit; $16,602.81, and the amount realized by said company, acting for said Hawes in the said retail sales . . and the said public sale, the said difference being the sum first mentioned in this paragraph, besides interest on said sum of $7,722.12 from April 9, 1904, at seven per cent. per annum." The 22d paragraph alleged, "that said Hawes has damaged petitioner by his said breach of said contract in the further sum of $236.80," the expenses incurred in the retail sales, "and in the further sum of $6 for cost of advertising" the sale of the goods at auction, "and the further sum of $2 as set forth in paragraph 15" of the petition [the wheelbarrow transaction], "besides interest on all of said sums," etc. The 23d paragraph alleged "that by said breach of said contract by said Hawes" and his refusal to pay the petitioner's just damages arising therefrom, it was necessary for the petitioner to employ counsel to collect the damages, "thus entailing on petitioner the further loss and damage of $1,000," which was a reasonable attorney's fee for such services. Judgment in accordance with these allegations as to the plaintiff's damages was prayed.

The defendant demurred to the petition upon various grounds, among which were, that it set forth no cause of action, and that the paragraphs in reference to the valuing of goods by Whiteside and Gaines were insufficient in law to charge the defendant with any liability to the plaintiff, "there being, under the contract sued on, no provision for the valuing of the merchandise described in the contract sued on otherwise than as prescribed by said contract." The plaintiff offered three amendments to the petition, which are indicated in the following opinion, which were demurred to by the defendant and disallowed by the court. The court then sustained the demurrer to the petition and dismissed the same, and the plaintiff excepted.

*S. L. Olive* and *E. K. Lumpkin,* for plaintiff.

*J. N. Worley, Z. B. Rogers,* and *VanDuzer & Tutt,* for defendant.

FISH, P. J. (After stating the facts.) 1. In our opinion, the court was right in holding that the petition failed to set forth a cause of action. It declared upon an alleged written contract of sale, wherein the plaintiff was the seller and the defendant the purchaser of a described. stock of merchandise, and sought to recover a balance alleged to be due upon the contract price of the goods, after the plaintiff, upon the refusal of the defendant to take them, had sold them, at the latter's risk, and appropriated the proceeds from the sales toward the payment of the purchase-money. But the facts set forth in the petition as constituting the sale showed that no sale had taken place. The petition showed a written agreement between the parties, wherein the plaintiff agreed to sell and the defendant to purchase the stock of goods at a price to be determined by Owsley and Whiteside, guided by certain stipulations applicable, respectively, to depreciated or undepreciated goods, with a provision for the valuation of the depreciated goods by an umpire selected by them, in the event they failed to agree as to the valuation of such goods. The petition further showed that Owsley had refused to act as a valuer, and that no one had been selected by the parties to take his place, but that Whiteside and Gaines, whom Whiteside had selected to act with him, had made the valuation of the stock of goods. Therefore the petition showed that one of the essential elements of a sale was wanting, viz., an agreed price or consideration. Without a price there can be no sale, and while it is perfectly competent for the price to be fixed after the agreement to sell and purchase has been entered into by the parties, in accordance with the provisions therein upon the subject, yet if the price can not be so fixed there is no sale. ⌐Undoubtedly the written agreement between the parties would have resulted in a sale, if the conditions upon which the sale depended had been complied with, and both parties would then have been bound.⌐ They provided that the price should be fixed by Owsley and Whiteside, guided by the terms of the writing upon this subject, and, in the absence of any further agreement between them, until it was so fixed the sale was incomplete, and there could be no action by the intended seller against the intended buyer, upon a contract of sale, for the recovery of a price stipulated. The written instrument itself declared: "This sale to be complete and the said six thousand

dollars [the cash payment] due the day said stock-taking is finished;" and that "the said Hawes is to pay said company the sum of six thousand dollars in cash as soon as said stock of goods is taken and valued by said Owsley and Whiteside, and shall give to said company a note for the balance of the value of said goods," etc.; and it provided that the title to the stock of goods should remain in the Elberton Hardware Company "and remain its absolute property until the payment of the sum of six thousand dollars by said Hawes as hereinbefore specified." So it is clear that the agreement was executory upon both sides. There was no delivery, actual or constructive, of the goods by the hardware company to Hawes, nor any intention that the general property therein should pass from such company to Hawes upon the signing of the written instrument, but it was, as we have seen, expressly provided that the sale should not become complete until the conditions specified had been met. No person or persons other than Owsley and Whiteside, acting together, had the power, without the consent of both parties to the agreement, to fix the price of the goods, and thus supply the element missing in the agreement necessary to constitute a contract of sale. When Owsley refused to act in the premises, Whiteside had no authority whatever to select another valuer to act with himself in taking the stock and valuing the goods, nor could either of the parties to the agreement, without the consent of the other, do so. Where parties to an executory agreement for the sale of goods agree that the price to be paid for the property shall be fixed by valuers appointed by them, there is no contract of sale if the persons appointed as valuers fail or refuse to act; and this is true even where one of the parties to such an agreement is the cause of such failure or refusal. 1 Benj. Sales, § 87; Beach on Sales, § 213; Tiedeman on Sales, § 46; Thurnell v. Balbirnie, 2 C. B. 786; Cooper v. Shuttleworth, 25 L. J. Ex. 114; Vickers v. Vickers. 4 Law Rep., Eq. 529; Milnes v. Gery, 14 Ves. Jr. 400; Wilks v. Davis, 3 Mer. 507; Hutton v. Pearce, 26 Ark. 382; Fuller v. Bean, 34 N. H. 290. Where the agreement has been executed by the delivery of the goods and the purchaser has done any act which prevents their valuation being fixed as the agreement provides, the vendor is entitled, in a proper action, to recover the value of the goods, estimated by the jury. 1 Benj. Sales, § 87; Beach on Sales, § 213; Clarke v. Westrope, 18 C. B. 765; Humas-

ton v. American Telegraph Co., 20 Wall. 20; Smyth v. Craig, 3 Watts & S. 14.

In 12 Encyclopædia of Laws of England, 405–6, the following principles, deducible from the English cases, are stated: "Where there is an agreement for the sale of property at a valuation to be made by persons appointed by the parties, or nominated by the agreement, the making of the valuation according to the terms of the agreement is a condition precedent; and if, by reason of the refusal of either of the parties to appoint a valuer, or to allow his valuer to proceed, or by reason of death, refusal to act, or disagreement of the valuers nominated by the agreement, the valuation is not made in accordance therewith, there is no contract which can be enforced by the court, the vendor not being bound to sell, nor the vendee to purchase, the property at a valuation to be ascertained by the court, or in any other manner than that indicated by the agreement. . . . The court can not, in such a case, compel a party to appoint a valuer, or to allow a valuer appointed by him to proceed." The "sale of goods act" of 1893 (56 & 57 Vict. c. 71), which codified the law of England upon the subject of the sale of goods, provided that, "Where it is agreed that the price shall be fixed by the valuation of a third party, and such third party can not or does not make such valuation, the agreement is avoided; but if in such a case the goods or any part thereof have been delivered to or appropriated by the buyer, he must pay a reasonable price therefor; and if the third party is prevented from making the valuation by the fault of the seller or buyer, the party not in fault may maintain an action for damages against the party in fault." 11 Enc. Laws of Eng. 351.

The petition in the case with which we are dealing can not be construed as an action for the reasonable value of the goods; for the purpose to declare upon and recover under the alleged contract of sale is manifest and clear. Even if it could be so construed, such a suit would not lie, because as we have seen, there was no delivery, actual or constructive, of the goods by the hardware company to Hawes, nor any intention that the general property therein should pass to Hawes before the stock was taken and valued as the agreement provided.

2. The first amendment offered for the purpose of curing the defects in the petition sought to show that the defendant was

bound by the acts of Whiteside and Gaines in taking the stock and fixing the valuation thereof, because the plaintiff had, by written communications, notified him of the refusal of Owsley to act as a valuer and requested him to select some one in his place, and informed him that, if he did not do so, the plaintiff would at once proceed to have the stock taken and valued under the supervision of Whiteside and such other person as he might select, and the defendant had made no reply to such communications. It was alleged that the defendant's silence, under the circumstances, and his failure to object to the course which the plaintiff proposed to pursue, was a fraud upon the plaintiff and estopped the defendant from objecting to the taking of the stock and the valuation thereof by Whiteside and Gaines.    It is evident that this amendment, if allowed, would not have cured the defect in the petition.    The defendant was bound only to the extent of his agreement, and that agreement could not be changed or modified without his consent.    Certainly a mere failure on his part to reply to a written notice by the plaintiff that it intended to have the stock taken and valued otherwise than as the agreement provided could not be construed as a consent by him that it should be so taken and valued; especially is this true when the petition alleged that the defendant "refused to notice the letters" of the plaintiff upon the subject; which was tantamount to a refusal on his part to have the valuation of the stock made by persons other than those named in the agreement.    Besides, the letters of the plaintiff to the defendant upon the subject, copies of which were attached to and made parts of the petition, clearly showed that the plaintiff could not have acted upon the belief that the defendant consented for the stock to be taken by Whiteside and some other person named by him.    These letters showed that, after Owsley refused to act further as a valuer, the plaintiff sought in vain to get the plaintiff to appoint some one else to take his place, and that it must have known that the failure of the defendant to reply to its notice, or threat, that, if he did not do so it would have the stock taken and valued by Whiteside and some one selected by him, was not equivalent to his consent that this should be done.    There is no room for the doctrine of estoppel here.

3. The second of the proposed amendments alleged that the refusal of Owsley to proceed with the taking and valuation of the stock "was with the full knowledge and acquiescence of the said

Hawes, and that he agreed with said Owsley that he should so refuse," and that this conduct on the part of the defendant was a fraud on the rights of the plaintiff, and that the agreement between the·defendant and Owsley was made with the intention of avoiding and vitiating the contract.    The third amendment offered enlarged and amplified these charges by alleging that the defendant advised and procured Owsley so to refuse, in order that the defendant might thereby escape and render the contract of sale void, and that this conduct on his part was a fraud on the plaintiff;" and that the defendant was therefore estopped from denying the validity and binding effect upon him of the acts of Whiteside and Gaines in taking and valuing the stock, and his refusal to accept and pay for the same was ·a breach of said contract, for which the plaintiff prayed· damages in the sum alleged in the original˙petition.    These proposed amendments were demurred to upon the ground that they set up a new cause of action, and the court sustained the demurrer.    We do not think that, fairly ●construed, they set up a new cause of action, for the purpose of the plaintiff to recover for a breach of the alleged contract of sale was still adhered to, and these amendments appear to have been offered for the purpose of precluding the defendant from denying its existence and validity.    With this object in view, they invoked the doctrine of estoppel.    But it is evident that the ˌdefendant could not be estopped from denying the contract by any act of his which prevented it from coming into existence.    Certainly his alleged fraudulent conduct after the agreement was entered into did not induce the plaintiff to change its position or to part with anything of value.    It was not something which amounted to a representation or admission, in reliance upon which the plaintiff changed its position by parting with property or incurring a liability.    It as effectually prevented the plaintiff from becoming bound as it did the defendant, and it is obvious that no estoppel can arise from such an act.    The defendant may have rendered himself liable ˙to the plaintiff in damages by preventing the valuers nominated in the written agreement from valuing the stock in accordance therewith and thus rendering the contract complete, but it can not be held that by so doing he estopped himself from claiming that the contract had not become complete.

If the defendant had taken the goods under his covenant to pay their value when subsequently ascertained in a particular mode, and had then prevented this method of ascertaining and fixing the value from being adopted, he could not take advantage of his own wrong and prevent the plaintiff from showing to the court and jury what this value was. The plaintiff could then have sued him, not for the price of the goods fixed by contract, but for their reasonable value, and recovered a judgment against him for such value as determined by the jury. Humaston *v.* American Teleg. Co., supra. But we have seen that the suit was not for a quantum valebant, and that, even if it had been, the facts alleged, if proved, would not have sustained such an action, as the property in the goods never passed to the defendant. As the suit was for the breach of the alleged contract of sale, and as the facts alleged, even if the amendments with which we are now dealing are considered as having been allowed, fail to show the existence of such a contract, it does not matter whether the court was right or wrong in holding that these amendments set up a new cause of action. If they did, the court was right in disallowing them upon that ground; if they did not, their allowance would not have cured the fatal defect in the petition.

The suit was not even good for the two dollars which it alleged the defendant received for a wheelbarrow sold from the stock while Owsley and Whiteside were engaged in taking the same, and had retained; for the plaintiff sought to recover this amount from the defendant as a part of the damages alleged to have resulted from the breach of the alleged contract, and not upon an implied contract, as money had and received for the plaintiff's use. It follows that there was no error in sustaining the demurrer to the petition.

*Judgment affirmed. All the Justices concur, except Candler, J., absent.*