COAL CO. v. ICE CO.

(Filed April 5, 1904).

1. ISSUES—*Trials—Sales.*

In this action to recover for goods sold the issues submitted were sufficient.

2. SALES—*Contracts—Damages.*

Where a contract is made for the purchase of coal and the purchaser actually receives a part of the same, the seller may recover the amount of the sales over and above the damage resulting from the breach of the contract for failure to deliver the whole.

3. SALES—*Vendor and Purchaser—Contracts.*

A contract for the sale of coal to the defendant for a specified period does not bind the defendant to submit to a reduction of the amount of coal by prorating with the seller's other patrons.

4. SALES—*Damages—Measure of.*

In an action for failure to deliver coal the measure of damages is the difference between the contract and market price at the time of the breach, subject to the qualification that the buyer must use reasonable diligence to lessen the damages.

CLARK, C. J., dissenting as to measure of damages.

ACTION by the Indian Mountain Jellico Coal Company against the Asheville Ice and Coal Company, heard by *Judge W. A. Hoke* and a jury, at May Term, 1903, of the Superior Court of BUNCOMBE County.

This action was brought to recover the sum of $361.54 alleged by the plaintiff to be due from the defendant for coal sold and delivered to it in the months of February and March, 1899. The coal was delivered under a contract between the parties, of which the following is a copy:

COAL CO. *v.* ICE CO.

"JELLICO, TENN., April 12, 1898.

"This agreement, entered into this day by and between Indian Mountain Jellico Coal Co., of Jellico, Tenn., and Asheville Ice and Coal Co., of Asheville, N. C., Witnesseth: Party of the first part hereby agrees to sell party of the second part all the coal that may be required by said second party between this date and May 1, 1899, at the following price per ton of two thousand pounds f. o. b. mines. (Description of coal with prices per ton.) Shipments to be made promptly when ordered unless prevented by strikes or other causes beyond the control of the party of the first part. It is further agreed that the party of the second part has the exclusive agency for the sale of Indian Mountain coal in Asheville market. Payments due succeeding month's shipment from September 1, 1898. In consideration of the foregoing, the party of the second part agrees to handle no first-class coal except such as it may purchase from the party of the first part."

The plaintiff in its complaint alleged (1) that it had sold and delivered the coal under the contract; (2) that it was reasonably worth $361.54, and (3) that the defendant promised to pay that price for it. The defendant in its answer admits the truth of the first two allegations of the complaint and also admits the third allegation, "except as stated in its further defense and counter-claim," in which it admits that it has not paid the said sum to the plaintiff, but denies that it is due and owing, because, as it avers, by reason of plaintiff's failure to comply with its part of the contract the defendant has been damaged "in a sum far greater than the said sum of $361.54, to-wit, in the sum of $1,000, and that the defendant does not now, nor did at the commencement of the action, owe the plaintiff any sum whatever because of the damage aforesaid, as the defendant

is advïsed and believes." There was a denial of this counter-claim in the reply. The issues submitted, with the answers thereto, were as follows:

1. Is the defendant indebted to the plaintiff for coal sold and delivered, and if so, in what sum? Answer. Yes; $361.54 and interest from March 31, 1899.

2. Did plaintiff and defendant enter into the contract set out and described in defendant's counter-claim? Answer. Yes; September 2, 1898.

3. Did the plaintiff wrongfully and in a breach of its contract fail or refuse to deliver defendant's coal as therein required? Answer. Yes.

4. What damage is defendant entitled to recover of plaintiff for such wrong and injury? Answer. $150.

The other facts appear in the opinion. Judgment was rendered for the plaintiff, and defendant excepted and appealed.

*Moore & Rollins* and *H. B. Lindsay,* for the plaintiff.
*Merrimon & Merrimon,* for the defendant.

WALKER, J., after stating the case. The defendant insisted that it was entitled to rely upon its counter-claim in bar of any recovery by the plaintiff and that the issue should be, "Is the defendant indebted to the plaintiff, and if so, in what sum?" and also, that there should be issues on the counter-claim as to the surplus. We do not think the defendant has pleaded the matters set forth in the counter-claim strictly in defense as a bar to the plaintiff's recovery, and the Court so held. The counter-claim would of course have operated as a bar if the jury had found that defendant's damages for the breach of the contract by the plaintiff equalled or exceeded the amount of the plaintiff's claim, and in that event it would have been a bar in fact, though not

in law, that is, it would not have been a bar within the
technical meaning of that word. The Court held at the out-
set, and "at the request of the defendant" as the Court
recalled, "and certainly without objection by the defendant
to the ruling," that the burden of proof was on the defend-
ant. If the defendant's present contention as to the proper
issues and as to the state of the pleadings is correct, and the
plaintiff was required to show performance of the contract
on its part before it could recover, the burden was on the
plaintiff and not on the defendant, as ruled by the Court.
We understand from the record, and by that we must be
governed, the defendant insisted at the trial that upon the
answer as drawn the issues should be so framed as to re-
quire the jury in response to the fourth issue to assess the
defendant's damages in excess of the amount due the plaintiff
for the February and March deliveries. While the form
of the answer did not entitle the defendant to such an issue,
we think the issues as framed enabled the defendant by a
proper prayer for instructions to present this view to the jury,
and it is not required that issues should be submitted in any
particular form, provided the parties have the opportunity
of presenting their case fully to the jury upon the law and
the evidence applicable thereto. *Patterson v. Mills,* 121
N. C., 258. We have been unable to perceive what legal
or practical difference there is between assessing the full
amount of damages under the fourth issue, as was done in
this case, and confining the assessment to the excess of dam-
ages or the difference between the plaintiff's claim and the
full amount of the defendant's damages. The usual and the
better practice is that which was adopted by the Court, and
under the clear and explicit instructions to the jury we do
not see how they could possibly have been misled as to the
true nature of the controversy. The plaintiff, as we will
show hereafter, was entitled to recover the value of the coal

134——37

sold and delivered to the defendant, or the price agreed to be paid therefor, which in this case are the same in amount, and the defendant was entitled to have assessed by the jury the full amount of the damages arising out of the breach of the contract by the plaintiff, if any, and the difference between these two amounts, whether in favor of the plaintiff or the defendants, is of course the amount of the judgment to be rendered against the party recovering the smaller sum. There is no error in this ruling of the Court.

It was contended in the argument before us by the defendant's counsel that, as the jury had found there was a breach of the contract by the plaintiff its right to recover anything is wholly barred, and we were asked, "Can one who has wrongfully refused to do what he contracted to do recover for a part performance?" Our answer to this question is that, under the circumstances of this case, he can. In the first place, this is not an entire contract. The shipments made in any one month were to be paid for in the next succeeding month and the price per ton of the coal was fixed. It appears from the testimony that the breach of the contract, or the failure to make deliveries under it, upon orders from the defendant, occurred prior to February. Mr. Collins who was the president and manager of the defendant company and a witness for it, testified that between September 20th to February and March the defendant ordered and the plaintiff failed to deliver about 807 cars of coal. The case shows that it is not meant by this testimony that there was any failure to deliver in February and March, and, even if that had been the case, we do not think it would make any material difference in the view we take of the law. It would be manifestly unjust, treating the contract as divisible, to permit the defendants to receive and use the coal delivered in February and March and refuse to pay for it, merely because the plaintiff had failed to fill orders for any

one or more of the preceding months, and especially so when
the defendant at the time he received the coal in Febru-
ary and March well knew of the prior breaches.   *Tipton v.*
*Feitner,* 20 N. Y., 423; *Ming v. Corbin,* 142 N. Y., 334.
We will go further and declare the law to be that if the
breach by the plaintiff had occurred in the same month
when the coal for the price of which this action is brought
was delivered, the defendant could not defeat a recovery by
the plaintiff, provided he received the coal and had the full
benefit of it.    Where the agreements go to the whole of the
consideration on both sides the promises are dependent, and
one of them is a condition precedent to the other, and full
performance is required before there can be any recovery,
as in the case of *Lawing v. Rintles,* 97 N. C., 350; but this
rule does not apply if, for instance, work has not been done
or materials furnished in strict accordance with the con-
tract, provided one of the parties has received and enjoyed
any benefit from the contract, and certainly not unless full
performance is made a condition precedent to payment. The
law implies a promise by the party to pay for what has been
thus received, and allows him to recover any damages he has
sustained by reason of the breach, for this is exact justice.
The language of the Court in *Britton v. Turner,* 6 N. H.,
492, 26 Am. Dec., 713, seems to fit this case: "If, where
a contract is made of such a character, a party actually re-
ceives labor or materials, and thereby derives a benefit and
advantage over and above the damage which has resulted
from the breach of the contract by the other party, the labor
actually done and the value received furnish a new consider-
ation, and the law thereupon raises a promise to pay to the
extent of the reasonable worth of such excess.    This may be
considered as making a new case, one not within the original
agreement, and the party is entitled to 'recover on his new

case' for the work done, not as agreed, but yet accepted by the defendant."

In *McClay v. Hedge,* 18 Iowa, 66, the Court, by *Dillon, J.,* referring to *Britton v. Turner,* says: "That celebrated case has been criticised, doubted, and denied to be sound, yet its principles have been gradually winning their way into professional and judicial favor. It is bottomed on justice and is right upon principle, however it may be upon the technical and more illiberal rules as found in the older cases." And the same Court, in *Wolf v. Gerr,* 43 Iowa, 339, states it to be the settled doctrine "that a party who has failed to perform in full his contract, may recover compensation for the part performed, less the damages occasioned by his failure." This principle is fully sanctioned by the authorities. *Chamblee v. Baker,* 95 N. C., 98; *Simpson v. Railroad,* 112 N. C., 703; *Gorman v. Bellamy,* 82 N. C., 496. In the case last cited this Court said: "The inclination of the Courts is to relax the stringent rules of the common law, which allows no recovery upon a special unperformed contract itself, nor for the value of the work done, because the special excludes an implied contract to pay. In such a case if the party has derived any benefit from the labor done, it would be unjust to allow him to retain that without paying anything. The law therefore implies a promise to pay such remuneration as the *benefit conferred* is really worth." The Court also said in *Brown v. Morris,* 83 N. C., at p. 257: "If there had been delivered a smaller number of bricks, and they had been received and used by the defendant without objection, we see no reason why the plaintiff would not be entitled to compensation for such as' were delivered; and we are not disposed to carry the doctrine that a partial delivery under an agreement to deliver a definite quantity or number of goods leaves the purchaser the possession and use of such as are delivered without liability

to the seller, beyond the decided cases, and as operating only when the failure to deliver is wilful and without legal excuse." *Monroe v. Phelps,* 8 El. & B., 739; *Reade v. Rann,* 10 B. & C., 438; *Leonard v. Dyer,* 26 Conn., 172, 68 Am. Dec., 382; *Horne v. Batchelder,* 41 N. H., 86; *Bush v. Jones,* 2 Tenn., 190; *Duncan v. Baker,* 21 Kan., 99; *Lamb v. Brolaski,* 38 Mo. App., 51; *Myer v. Wheeler,* 65 Iowa, 390; *Hansen v. C. S. H. Co.,* 73 Iowa, 77; *M. L. Co. v. Coal Co.,* 160 Ill., 85, 31 L. R. A., 529.

The doctrine is well stated and supported by the citation of numerous authorities in 9 Cyc. of Law and Pro., pp. 686 and 687, note 15.

The defendant excepted to an instruction in regard to the date of the contract, but we can not see how the date is material, as the parties, according to the very terms of the contract, agreed that shipments should be made from September 1, 1898, and this is the construction placed upon the contract by defendant in its first prayer for instructions.

The remaining exceptions relate to the Judge's charge upon the counter-claim and especially to the measure of damages. The defendant contended that the plaintiff was bound to supply it with coal under the contract, unless prevented from doing so by strikes or other causes beyond the plaintiff's control, even though it had other customers at the time who had entered into similar contracts with the plaintiff, and that this is so, because the defendant had shown by the testimony that the plaintiff had represented, when the contract with the defendant was made, that it had no other outstanding contract and would make no other. It is sufficient to say, in regard to this matter, that it was fairly submitted to the jury and found against the defendant, or the latter had at least the full benefit of the point under the charge of the Court. But it becomes immaterial, in the view we take of the case, as will appear hereafter. The

Court charged the jury, substantially, that, if the plaintiff failed to ship the coal to the defendant upon its orders according to its agreement and was not prevented from doing, so by strikes or other causes beyond its control, and which it could not have avoided by the exercise of ordinary care, it would be liable to the defendant for such damages as the latter sustained by reason of the breach, and that if at the time the plaintiff had other customers similarly situated with the defendant in respect to contracts with the plaintiff of the same character, and the plaintiff by reason of causes beyond its control could not fully supply all, the latter had the right, and it was its duty under the law, to apportion its shipments pro rata among its said customers, provided it did so in good faith and with perfect fairness to each, and provided it had not represented that there were no contracts other than the defendants' and had not agreed that it would make no other contract. If, in fact, there were no other contracts, then this instruction would not apply, and plaintiff would be liable in damages, unless the jury found under the charge of the Court that the plaintiff was protected by the clause of dispensation in regard to strikes and other causes beyond the plaintiff's control. The plaintiffs say that this instruction is sustained by the cases in which it has been held that railroad companies should not discriminate against any of its customers in the transportation of freight. It is true it has been held that it is no proper business of a railroad company, as a common carrier, to foster particular enterprises or to build up new industries; but deriving as it does its franchises from the Legislature and depending upon the will of the people for its very existence, it is bound to deal fairly with the public and to provide reasonable facilities for transportation of persons and property and, in this respect, to put all its patrons upon an absolute equality. *Railroad v. Goodridge,* 149 U. S.,

680; *U. S. v. Railroad,* 109 Fed. Rep., 831.   In the latter
case it is held that while the capacity of a shipper of coal
may be greater than  his allotment of cars, yet when such
is also the case with every other operator similarly situated
in the coal field, it is the duty of the railroad company
when the supply of coal cars is short to prorate the supply
on hand, without unjust discrimination, among all the oper-
ators, including the shipper in question.   4 Elliott on Rail-
roads, section 1468, *et seq.; Root v. Railroad,* 114 N. Y.,
300, 4 L. R. A., 321, 11 Am. St. Rep., 643.   But those
cases were decided under the provisions of the Interstate
Commerce Act and upon the principles of the common law
forbidding discrimination, and the doctrine is confined to
cases where the party from whom the particular duty is
owing is a common carrier, or is operating under a public
franchise which imposes upon it certain obligations and re-
sponsibilities with respect to the public and to those who deal
with it in its capacity as a *quasi* public corporation.   We
are unable to see that they have any application to the facts
of this case, nor did the learned counsel refer us to any au-
thority for the principle upon which the Court directed
the jury to assess the defendant's damages, nor have we
been able to find any.   The question therefore must be de-
cided according to the ordinary rule in the law of contracts.
It is a well-settled principle of law that if a party by his
contract charges himself with an obligation possible to be
performed, he must make it good, unless its performance is
rendered impossible by the act of God, the law or the other
party.   Unforeseen difficulties, however great, will not ex-
cuse him.   The law regards the sanctity of contracts and
requires parties to do what they have agreed to do.   If un-
expected impediments lie in the way, and a loss must ensue,
it leaves the loss where the contract places it.   If the parties
have no provision for a dispensation, the rule of law gives

none.  It does not allow a contract fairly made to be an-
nulled, and it does not permit to be interpolated what the
parties have not stipulated.  *Ingle v. Jones,* 2 Wall., 1.
The Courts will not make an agreement for the parties, but
will ascertain what they have agreed by what they have
said and by the meaning of the words used to express their
intention.  Where the intention clearly appears from the
words used, there is no need to go further, for in such a
case the words must govern; or, as it is sometimes said, where
there is no doubt there is no room for construction.  Clark
on Contracts, p. 591.  We must assume that the parties
have fully and clearly expressed their agreement in the in-
strument which is the evidence of it, and to add to or take
from it by construction, would, under the circumstances, be
the same as if we should arbitrarily give to it a meaning
they did not intend it should have.  We must therefore as-
certain and enforce their intention as they have expressed it.
"Where parties have entered into written engagements with
express stipulations, it is manifestly not desirable to extend
them by implications; the presumption is that having ex-
pressed *some* they have expressed *all* the conditions by which
they intend to be bound under that instrument."  Broom's
Legal Maxims (8 Am. Ed.), star page 652; Bishop on Con-
tracts (Ed. of 1887), sections 380-381; 2 Parsons on Con-
tracts (9 Ed.), star page 515.  In *Aspdin v. Austin,* 5 Q.
B., p. 683 (13 L. J., 155), *Lord Denman* says: "It is one
thing for the Court to effect the intention of parties to the
extent to which they may have even imperfectly expressed
themselves, and another thing to add to an instrument all
such covenants as on a full consideration may seem to the
Court to have been the complete intention of the parties, but
which they either purposely or by inattention omitted.  It
would be but a bad application of the rule of construction of
written instruments to add to the obligation by which the

parties have bound themselves. This would be quite unauthorized, as well as liable to create particular injustice in the application." By the contract in question the plaintiff was bound to sell and deliver to the defendant all the coal that should be required by the latter between the dates mentioned in the writing. Nothing else appearing, this was an absolute promise on the part of the plaintiff, based upon a sufficient consideration to furnish the coal and nothing, as we have already seen, would excuse its performance, except the act of God, the law or the act or conduct of the defendant. But, there was one, and only one, limitation upon this otherwise absolute undertaking, and that limitation is found in the clause of dispensation, as it may be called, which exempted the plaintiff from liability for non-performance, if by strikes or other uncontrolable causes it should become unable to comply with its contract. This being the case, what right have we to add a further clause of exemption and provide that the plaintiff should not only be excused from full performance by strikes and other causes beyond its control, but that the defendant should be required to submit to a reduction of the quantity of coal to which it was entitled under the contract by prorating with other patrons of the plaintiff company, when there is no such stipulation in the contract and nothing from which it can be clearly inferred that the parties intended such a settlement under it. If the defendant's rights can be impaired by the fact that the plaintiff has entered into other contracts of the same kind, why could they not as well be affected by any other contractual relation the plaintiff may have assumed. The plaintiff's contract was not, as to its customers, a joint one, but must be treated and dealt with as several, and the rights of each customer are to be determined solely with reference to the contract made with him, and it was the duty of the plaintiff to take care that it did not go beyond its ability to

perform, and to provide against any and all contingencies in the contract itself.    We can not release the plaintiff from any part of its liability because it has failed to do so in this case, but must leave the loss where the contract places it. To do otherwise would be to make the contract, and not to construe it.

We are not permitted to interpret a contract according to our notion of what may be fair and just, unless, perhaps, in a case where the terms of the contract are in themselves ambiguous.    In this case they are not so.    The contract is plainly one to furnish a stipulated quantity of coal at a fixed price, without any reference to other contracts made or to be made by the plaintiff, and subject only, in the ultimate settlement between the parties under its provisions, to any failure by the plaintiff to perform its undertaking which it could show to be the result of the causes beyond its control specified in the contract.    It was not the duty of the defendant to protect itself against other contracts made by the plaintiff, but it was the latter's duty to make suitable provision in the contract for his own protection in respect to them. If the rule laid down by the Court below is adopted, any reduction in the quantity of coal to be delivered under the contract will be made to depend, not upon causes beyond the control of the plaintiff, but upon causes of his own creation. The reduction will be in proportion to the number of contracts that its interest or cupidity might lead it to make. When the question is properly considered, there is no more reason for applying the *pro rata* rule in a case where the coal dealer is protected by a clause of exemption against any failure which results from causes beyond his control, than there would be for enforcing it when there is no such clause of exemption in the contract.    We must remember that a contract is to be construed according to the intention of the parties as expressed in it, upon the principle that every one

of age and discretion and qualified to do so can make any contract he pleases, and we have no right to give the contract a meaning based upon any idea or consideration of abstract justice. When there is no allegation of fraud or undue influence, or of any other circumstance which can form the basis of an equity for setting aside the contract, we must assume that the parties understood what was fair and right when they entered into it and were fully mindful of its obligations. If the capacity of the plaintiff's mine was so reduced "by causes beyond its control," that it could not furnish the quantity of coal agreed to be furnished, it was entitled to the benefit of the clause of exemption, but if, by reason of our construction, which, we think, is in accordance with the plain words of its agreement, it suffers any loss or will be made to respond in damages to this defendant, or any of its other customers, it will be the result of its own folly in making a contract, which, as it turns out, can not be performed. This does not present an unusual case in the enforcement of contracts. It is a mistake to suppose that by construing the contract according to the ordinary and well-settled rules, the clause of exemption will be rendered nugatory. It may not have the meaning or effect that the plaintiff now thinks it ought to have, but it will have full operation in accordance with the intention as expressed in it, and that intention must be our only guide in ascertaining the rights and liabilities of the parties.

We have discovered no error in the other instructions given by the Court to the jury. We do not think that the plaintiff was required under the circumstances to buy any coal from other miners in order to fill the contract which was made with reference to its own mine in Jellico, that is, in so far as the plaintiff was prevented from delivering upon orders by causes beyond its control.

The ordinary rule as to damages undoubtedly is that,

when a vendor fails to comply with his contract, the vendee
is entitled to recover the difference between the contract and
market price at the time of the breach.    *Spiers v. Halsted,*
74 N. C., 620; *Holesley v. Elias,* 75 N. C., 564; *Oldham
v. Kerchner,* 79 N. C., 106, 28 Am. Rep., 302; *McHose v.
Fulmer,* 73 Pa., 365; 8 Ad. & El., 604; *Grand Tower Co.
v. Phillips,* 23 Wall., 471.    But the general rule is subject
to the qualification that a party to a contract is required to
use reasonable diligence to mitigate the damages caused by
the breach and, in contracts of this kind, the vendee should
provide himself as cheaply as he conveniently can, from the
most accessible sources, and thus lighten the loss, and his
recovery will be curtailed by the sum which thus might have
been saved.    *Oldham v. Kerchner, supra; C. C. L. Ice Co.
v. Tamm,* 90 Mo. App., 189; *Warren v. Stoddart,* 105 U.
S., 224.    It is true that the injured party is to be placed as
near as may be in the situation he would have occupied if
the wrong or breach had not been committed, and that, when
a wrong has been done and the law gives a remedy, the com-
pensation should be equal to the injury, but this is only
another way of stating the same rule of damages, and it is
therefore subject to the same qualifications.    *Wicker v. Hop-
pock,* 6 Wall., 94; *Hassard v. Hardison,* 114 N. C., 482;
1 Southerland on Damages (3 Ed.), section 89.    There
must of course be evidence to which the rule can be applied.

While it is not necessary to consider the other exceptions,
we have examined them and think that they are without
merit.    The error in the charge of the Court, above indi-
cated, entitles the defendant to a new trial, but it will be
restricted to the *fourth issue.*

New Trial.

CLARK, J., dissenting as to measure of damages.    The
contract provides for an exemption from liability for fail-

ure of the plaintiff to ship if "prevented by strikes or other causes beyond the control" of the plaintiff. The Judge charged, in substance, that if the plaintiff had contracts with the defendant and others of like purport covering the same period of time, and there was no contract with the defendant that such contracts should not be made with others, then, if there was a failure to ship to the defendant the quantity required, the plaintiff would be liable only to the extent that it was not prevented from shipping by such strikes or other causes beyond its control, *i. e.,* that the defendant in such case could only claim loss on its *pro rata* part of what the plaintiff was permitted by the "strike or other causes beyond its control," to mine and ship. This instruction was eminently fair and just. The defendant knew that the plaintiff was not running its mine solely to fill the defendant's contract, and that the plaintiff had insisted on protecting itself by a provision in the contract for exemption from liability for failure to ship when caused by "strikes or other causes beyond its control." If the defendant wished to get the coal anyhow, if mined, it should have stipulated that its contract should be filled regardless of the plaintiff's contract obligation to others. It is quite certain that the plaintiff would not have made such contract with the defendant.

Suppose, for argument's sake, the plaintiff was prevented "by strikes or other causes beyond its control" from shipping one-half the quantity stipulated by its several contracts, then clearly its duty to each of its contractees was to ship them one-half the quantity contracted for. The failure to ship any one such half would not be caused by "the strike or other causes beyond the plaintiff's control," but by the plaintiff's own volition in preferring other contractees, and the plaintiff would be liable to each for its shortage in not shipping the one-half, which upon a *pro rata* it could have shipped.

If the plaintiff should have shipped the full quantity to the defendant and is liable for the difference, then the plaintiff should have shipped the full quantity to every other one of its contractees and is liable for failure to do so, and the provision in its contracts for exemption from liability for any failure to ship, "caused by strikes or other causes beyond its control," would be a nullity, and the plaintiff would be liable just as if that important provision had been left out. No one, or more, contractees can be selected to bear the total failure to ship. If so, why should it not be the defendant, who in that event would recover nothing?

Knowing that the mine owners were not shipping exclusively to itself the defendant, by agreeing to the usual clause of exemption from liability for failure to ship caused by "strikes or other causes beyond the shipper's control," must have understood that it had no right to complain if the plaintiff abated the contract quantity *pro rata* according to the quantity it was prevented from shipping by such strikes or other causes beyond its control. This is the ruling always made as to shipments by common carriers, which is justified upon the above reason, arising out of the contract as well as upon public policy which forbids discrimination by *quasi* public corporations. This is not the case of an unqualified agreement to ship a certain quantity of coal, but there is an agreement for an exemption if prevented by certain causes, and the defendant should bear its *pro rata* part of the failure to ship caused by the happening of such stipulated contingency.

No precedent either way has been presented to us, but this is a reasonable and just construction of the clause in the contract, which otherwise is nugatory as a protection to the shipper for whose benefit it was inserted. It happens, it would seem, that this Court is the first to construe such contract, and there is every reason we should make a just and proper construction.