## WASHINGTON MILLS CO. v. C. N. FROHLICH and W. W. BARBOUR.

Western Section.    June 3, 1927.

Petition for Certiorari denied by Supreme Court, December 17, 1927.

1. **Contracts. Evidence. Evidence held to show a valid executory contract.**

   In an action on a contract for the sale of cotton, the evidence held to show a valid executory contract.

2. **Sales. Damages. Measure of damages for breach of contract of sale.**

   Both at common law and under the Sales Act, and under the Sales Act, in Tennessee and in North Carolina, the ordinary measure of damage for the seller's failure to deliver is the difference between the contract price and the market value at the time and place of delivery; and where the deliveries are by installment, the time of delivery will ordinarily be the date of the delivery of each installment successively, and the damage is arrived

at as to each successive installment by taking the difference between the contract price and the market price at the successive delivery dates; or, as is sometimes stated, the sum of the differences between the contract and market price of the quantity of each installment not delivered at the respective times of delivery and place of delivery.

3. **Contracts. Damages. Upon breach of contract the injured party must do what he can to reduce his damage.**

It is an established principle that when there has been a breach of contract, definite and entire, the injured party must do what fair and reasonable business prudence requires to save himself and reduce the damage, or the damage which arises from his own negligence will be considered too remote for recovery.

4. **Contracts. Measure of damages for breach of contract for future delivery.**

Where a contract for the delivery of a commodity at a stated time is breached, the measure of damages is the difference between the contract price on the date of the breach and the price that the party would on that date have had to pay, for the commodity delivered on the contract date.

5. **Contracts. Fixing of price in executory contract.**

Where in an executory contract the price is to be fixed at a later date and for any reason the price is not fixed both parties are released from the contract.

6. **Contracts. Price held never fixed in executory contract.**

In an action on a contract for the sale of cotton where the price of the cotton was to be fixed by the purchaser at a later date and the purchaser did not fix the price when demanding delivery of the seller, held that the purchaser could not recover for failure to deliver the cotton.

7. **Contracts. Damages. Plaintiff held not damaged when he could have replaced the commodity upon the breach of the contract without a loss.**

In an action to recover on a contract for the sale of cotton where the evidence showed that the purchaser upon the breach of the contract might have bought cotton at the same or a lower price, held no damages were shown.

Appeal from Chancery Court of Shelby County; Hon. Wightman Hughes, Chancellor.

Affirmed and bill dismissed.

Klewer, Gailor and Exby, of Memphis, for appellant.

Kyser, Allen & Overton, of Memphis, for appellee.

OWEN, J. The complainant Washington Mills Company has appealed from a decree of the chancery court of Shelby county dismissing its bill. The complainant operates cotton mills in North Carolina and Virginia. The defendants are co-partners and at the time of the filing of the bill were engaged in buying cotton in Memphis with an office in Memphis, Tennessee. The complainant manufactures cotton into cloth.

The complainant alleged that it purchased from the defendants on September 4, 1924, six hundred bales of middling, hard body western cotton from west of the Mississippi river at a price of forty points

on December quotations on New York Exchange. It was alleged that the said six hundred bales of cotton were to be shipped as follows: Seventy-five bales on October 10th; seventy-five bales on October 20th; seventy-five bales on November 10th; seventy-five bales November 20th, and seventy-five bales on the same dates in the months of December 1924 and January 1925, making eight shipments of seventy-five bales each, and on the 10th and 20th of the three latter months of 1924 and the first month of 1925.

.The bill alleged that said cotton was subject to the call of complainant at the basis price of forty points on December quotations, as shown by the New York Exchange. It was alleged that this was the usual and customary way of fixing the contract price of cotton in the cotton trade, and meant that the complainant would, at the time it desired, fix the price of said 600 bales of cotton purchased, and it would buy six hundred bales of cotton for December delivery through the New York Cotton Exchange, through a brokerage firm by the name of Post and Flagg, and that when complainant bought the six hundred bales of cotton through its brokers, Post and Flagg through the New York Exchange for December delivery, this would be the price complainant would pay the defendant for said six hundred bales of cotton, plus forty points, which forty points is called the basis.

The bill alleged that the defendants had breached their contract; that they had failed and refused to ship the cotton covered by said contract. It further alleged that the complainant did not fix the price of said cotton; that it did not buy futures as hedges against said cotton, for the reason that had it done so it would have been compelled to have accepted it delivered in the city of New York at the New York Cotton Exchange, and it might have been compelled and required under the rules of said Exchange to accept cotton of a different kind and character than that purchased from the defendants. The bill further alleged that the basis advanced on said cotton between the dates of the contract and the dates of delivery, or, in other words, after the market value of the cotton increased so that complainant sustained a loss by reason of the change in basis, complainant insisted that it has sustained a loss of $4818.75 by reason of defendant's breach of the contract.

The defendants denied that any contract had ever been made, but if it had, the complainant breached the same. Defendants relied upon the following defenses:

I. That Frohlich & Barbour were justified in treating the contract as canceled and in cancelling same and refusing to make any shipments.

2. That the conduct of the Washington Mills Company throughout and its institution of this suit was inconsistent and not in good

faith and is an attempt to hold Frohlich & Barbour liable for an alleged loss of some forty-eight hundred dollars, when no loss was in fact sustained.

3.   That the Washington Mills Company, the buyer, was not entitled to recover on an alleged executory contract in which there was no definite contract price fixed, but which merely fixed the method on which the price was to be later fixed on the call of the Washington Mills Company, and which price was never fixed or attempted to be fixed by the Washington Mills Company.

4.   That the Washington Mills Company was estopped by its conduct and failure to fix the contract price, to sustain the suit as brought, or to assert any claim whatever for an alleged breach of contract.

A jury was called for and empaneled, and it appears that no issues were formulated until about all the proof of the complainant and defendants had been submitted, when the Chancellor submitted one issue to the jury, viz: ''What was the amount of complainant's damage, if any.'' At the conclusion of all the proof, upon a motion made by the defendants, the Chancellor instructed the jury to answer the issue, ''none.'' The complainant seasonably filed its motion for a new trial, which motion was overruled, and it prayed and was granted an appeal to this court, and has assigned the following error: ''The court erred in peremptorily instructing the jury to answer 'none' to the issue 'what was the amount of complainant's damage, if any.' ''

The negotiations between the complainant and the defendants pertaining to the six hundred bales of cotton in controversy were had through one B. S. Moore, of Winston-Salem, North Carolina, acting as a broker for the defendant. Mr. Moore was to receive seventy-five cents per bale for the cotton he sold. He instituted suit for his commissions, which was tried with complainant's suit. During the pendency of the suit, however, Mr. Moore dismissed same and the trial proceeded between the complainant and defendants.

Counsel for complainant relies upon the following principles of law, and cites the following authorities in support therefor:

I.   Under the common law, the courts have broken away from the old civil law doctrine that unless the price is fixed in the contract, there can be no recovery thereunder. Phifer v. Erwin, 6 S. E., (N. C.), 672; Hardwick v. Can. Co., 113 Tenn., 657; Memphis Furniture Mfg. Co. v. Wemyss Furniture Co., 2d Fed. (2nd Series) 428; Chaffee v. Farmers Cooperative Elevator Co., 168 N. W., 616; Burlington Grocery Co. v. Lines, 120 Atl. (Vt.), 169.

2.   The law regards that as certain which can be made certain and therefore, the damages being capable of ascertainment, there is no impediment in the courts to a recovery. See authorities cited under

first proposition, and also Solter et al., v. Leedom & Worrell Co., 252 Fed., 133; Benjamin on Sales, 6th Ed., pages 169 and 170.

Counsel for the defendants rely upon the following propositions of law:

1. The buyer cannot maintain a suit for damage or loss on an executory contract to sell, on which no definite sale price is fixed, but which merely provides the method of fixing the price, where the buyer fails to fix the price or to make any attempt to do so. The obligations of the parties under such a contract are conditional upon the price being fixed substantially in the manner provided, and plaintiff's failure to fix the price relieves the defendants from all liability. Benjamin on Sales (6 Ed., pp. 169-170); Williston on Sales, Vol., 1, p. 321; 35 Cyc., p. 49, Note 20; Louisville Soap Co. v. Taylor, 279 Fed. Rep., 470; 27 A. L. R., 119, Certiorari denied, 259, U. S. 583; Western Paper Mfg. Co. v. Downing Box Co., 293 Fed., 725; Hutton v. Moore, 26 Ark., 394; Elberton v. Hawes, 122 Ga. 859; Allen v. Sams, 31. Ga. App., 405; Preston v. Smith, 67 Ill. App., 613; DeVane v. Fennell, 24 N. C., 36; Wittkowsky & Rintels v. Wasson, 71 N. C., 451; Phifer v. Irwin, 100 N. C., 74.

2. Plaintiff's failure to fix the price rendered it impossible to ever determine the contract price; and makes impossible any computation of difference in contract price and market value; and also makes impossible any definite ascertainment of any loss or damage to plaintiff, and constitutes a waiver of any claim for loss or damage (Same citations as in Propositions of Law I). Also, Farabee-Treadwell Co. v. Bank & Trust Co., 135 Tenn., 217; Webb v. Cooper, 8 Higgins, 438; Hazard-Short v. Hardison, 114 N. C., 482; Pender Lumber Co. v. Wilmington Iron Works, 130 N. C., 584; Coal Company v. Ice Company, 134 N. C., 574; Tillinghast v. Cotton Mills, 143 N. C., 285; Carson v. Bunting, 154 N. C., 530; American Lumber Co. v. Quiett Mfg. Co., 162 N. C., 395; May Mills v. McRae, 187 N. C., 707.

3. Where the breach is anticipatory, definite and entire, by unequivocal notice to the buyer of seller's refusal to make the forward deliveries of a commodity of highly fluctuating value; and where there is a decline in the market existing at the time of the breach, the buyer cannot recover more than the difference between the contract price, and the cost of procuring the goods elsewhere, at the time of the breach. Williston on Sales, Volume II, sec. 587, 599-g, 599-h; Sedgwick on Damages, Volume II, pp. 1253, 1257; Benjamin on Sales, p. 932; Samuels v. Drew, 24 R. C. L., 72; also pp. 85, 86; 288 Fed. Rep., 279; Hazard-Short v. Hardison, 114 N. C., 482; Coal Company v. Ice Company, 134 N. C., 574; Tillinghast v. Cotton Mills, 143 N. C., 273; Carson v. Bunting, 154 N. C., 532; Mills v.

McRea, 187 N. C., 708, 122 S. E., 762; Weld v. Telegraph Co., 199 N. Y., 100.

4. A broker is a middleman, in a sense the agent of both parties, and is a special, and not a general agent. He is clothed with limited powers only; and, where his principal has not held him out as having unconditional authority to deliver an instrument or contract, the principal is not bound by an unconditional delivery thereof, made in violation of his authority. 9 C. J., 511; 669.

5. The complainant's failure to give shipping instructions to enable the seller to line up and load, and have the first seventy-five bales cleared from the warehouse by October 10th; and complainant's failure to fix the price on the first installment of seventy-five bales on or prior to October 10th, to enable draft with bill of lading attached, to be drawn for payment, and complainant's impossible demand on October 17th, seven days after the first shipment date, that shipment be made in accordance with contract, was, in any event, a breach by complainant of the alleged contract, and discharged the defendants of further obligation or liability thereunder. Ault v. Dustin, 100 Tenn., 366; Wildberg Box Co. v. Darvy Lumber Co., 143 Tenn., 73; Tenn. Fertilizer Co. v. Int. Agr. Corp., 146 Tenn., 460; Vosburg. v. Southern Lumber Co., 147 Tenn., 649.

The principal facts shown by the record are as follows:

The contract sued on is alleged to have been consummated about September 13, 1924, in Winston-Salem, N. C., the home office of the Washington Mills Company by delivery of defendant's final acceptance to A. H. Bahnson, the president of the mill, by B. S. Moore, a cotton broker, representing the defendants, with offices in the same building with Bahnson.

Some weeks earlier in the cotton season, Frohlich had visited Winston-Salem and employed Moore as a broker; and on September 4th, after the exchange of several telegrams, Moore wired Frohlich and Barbour, he forwarded what purported to be copy of the Mill's middling inch western cotton, seventy-five bales for delivery on the 10th and 20th of October to January, inclusive, at forty points on December, which sale was confirmed by defendants by wire.

In the confirmation of this sale by Moore, the broker, to Frohlich and Barbour, he forwarded what promised to be copy of the Mill's acceptance.

This acceptance was promptly returned by Frohlich and Barbour by letter of September 6, 1924, calling attention to the fact that he had confirmed sale of Western Cotton, whereas, the acceptance contained the added provision "from west of Mississippi river," and advising that they had always understood that Western Cotton included Mississippi and West Tennesssee, and that they would have to have an interpretation of the word "Western" as to this; and

also calling attention to the fact that the Mill's acceptance provided for "hedges" to be carried with Post and Flagg, whereas Frohlich and Barbour did not do their future business with this firm, and advising that whenever the mills desired to call out the cotton it could either wire Frohlich and Barbour direct, or fix same through Gwatmey or Harris, Irby and Voxx, the future houses with which Frohlich and Barbour did business; and further advising, if the charges mentioned, to make the Mill's acceptance accord with the sales as confirmed by telegram, were not acceptable, it was perfectly agreeable with Frohlich and Barbour to cancel the sale.

Moore thereupon took the altered acceptance as signed by Barbour to Bahnson, who told Moore that he would accept the contract as originally written; and Moore, the broker, thereupon, without having disclosed to Bahnson the contents of Barbour's letter, or the fact that he desired an interpretation of the words "western growth," as above mentioned, and without any authority from Bahnson with respect to the interpretation and changes, and without advising Barbour that he had in any way presented the altered acceptance to the mill, wrote Barbour by letter of September 8th that he thought there could be no question or chance for criticism if Mississippi and West Tennessee cotton were included as "western growth." and that he thought that Frohlich understood that Post and Flagg were designated because Bahnson had Post and Flagg's wire in his office, and would expect to put through the fixing of prices over that wire even though such price fixation might be cut out immediately after notice of execution had been received; and Moore requested the return of the acceptance with the alterations in this regard changed to read as originally written.

It appears that Moore, the broker, did not communicate to complainant what he had written defendants on September 8th. Neither did he inform complainant of defendant's letter of September 6th. It appears that Moore was so anxious to make a contract of sale that he withheld material facts from his principal.

Barbour testified that after waiting until September 18th to receive advice of the Mill's approval of his interpretation, and not having received such advice of approval, Barbour wrote Moore on September 18th that he understood the mill had refused the contract under his interpretation and considered the sale canceled; but advising that if the mill still wanted the cotton at the price of forty on December, he was willing to ship, with the understanding that Mississippi-Tennessee Delta Cotton, that is, cotton grown in the Mississippi Delta or Tennessee within fifty miles of the river was included within the meaning of "western growth."

None of these matters, as to the meaning of "western growth," "hard bodied" and "special specifications as to inch cotton," as to

which Barbour wanted an interpretation, were discussed with Bahnson, who states that when Moore, following September 13th, delivered back to him the acceptance, he accepted same, and expected compliance by Frohlich and Barbour.

To line up seventy-five bales for shipment and to have same cleared from the warehouse and loaded in cars requires that the operation be begun a week or a little more than a week before the shipment date.

The contract was written on a printed form drafted by the complainant, and in addition to the number of bales, the character and quality of the cotton and dates of shipment, the contract further provided:

"Payment by sight draft with endorsed bill of lading on which three days is taken after presentation. Make drafts on Washington Mills Company and on shipments of Mayodan N. C., draw through Bank of Mayodan, Mayodan, N. C., and on shipments to Fries, Virginia, draw through First National Bank, Fries, Virginia.

"Prices per pound, f. o. b., Fries, Virginia, or Mayodan, N. C.; forty points on December, New York; all cotton subject to our (Washington Mills) call;

"All cotton rejected must be paid for immediately by sight draft and shipping instructions in twelve days. Interest will be charged from date we (Washington Mills Company) pay for cotton.

"Date of shipments, seventy-five bales tenth and twentieth of each month, October, November, December 1924, and January, 1925."

On October 15th the mill wired Frohlich and Barbour "when will you ship seventy-five bales due tenth wire answer;" to which they promptly replied, "we consider sale cancelled as we refused your contract and afterwards accepted with reservation and heard nothing from you so we supposed you did not accept same."

On October 17th, in response to advice by wire from the mill that they held contract signed by Frohlich and Barbour and demanding that shipment be made in accordance therewith, and advice by wire as to what may be expected Frohlich and Barbour again advised that having heard nothing from the mill after their reservations with regard to the original acceptance, they considered the trade cancelled; and also on October 17th, having received advice by letter from Moore that the Washington Mills had called his attention to the fact of non-shipments and expected delivery at once, since the time for shipment had already passed, Frohlich and Barbour again advised by wire direct to the Washington Mills that they had no contract and "will not make you any shipments now or later."

On October 18th, the mill by letter from A. H. Bahnson demanded compliance with the original acceptance without reservations and further advised: "We hope that you will see the wisdom of carrying out your obligations under the terms of the contract, but unless we

receive telegraphic advice from you upon receipt of this letter, and not later than October 21st signifying your intention to carry out your obligations, we shall protect our interests in accordance with and under the terms of the contract.''

The defendants did not answer the letter of October 18th. Mr. Barbour testified that he had repudiated the alleged contract and had advised that no shipments would be made then, or later, which was his message of October 17th, and he did not think it was necessary to reply to the letter of October 18th. It appears that the terms ''calling'' and ''fixing the price'' are synonymous, and the term ''subject to mills call forty points on December New York,'' means that the mill has the option to fix the price at the amount of the December New York Exchange future quotation at the time the call is made, plus forty one-hundredths of a cent per pound. The price may be fixed by notice direct to the other party to the contract. Any-one purchasing or selling futures by contracts executed through the New York Exchange becomes obligated to accept a tender of the actual cotton in the future month on which he trades, unless his contract to purchase is not canceled out or off-set by an equivalent future contract;—that is, a purchase of 100 bales of December futures may be off-set immediately, or at any time up to November 24th or 25th, prior to December. There must be five business days prior to December first. If there is a holiday within said time, one additional day is allowed.

The price obtaining on the New York Exchange for futures form the general foundation or basic price on which the actual cotton or ''spots'' are bought or sold.

New York future quotations are based on middling seven-eights inch cotton, that is—cotton having staple of seven-eights inch in length, and of ''middling'' grade, is tenderable and may be delivered in New York in December in discharge of a seller's ''December contract'' previously executed on the Exchange. December futures, of course, become ''spots'' in December, as the actual cotton is then deliverable thereon.

The difference in market value at any particular time as to any particular grade over or under the future market depends of course on whether the particular cotton is of better or poorer grade and staple than seven-eights ''middling,'' and also on the crop conditions with respect to the forward delivery dates.

This difference or differential in actual market value, as compared to the then existing future quotations, is referred to in the trade as the ''basis;'' and the basis is referred to as ''on'' or ''off,'' accordingly as to whether or not it is above or below the quotation of futures.

Vol. V. T. A.—15.

As the name "future" implies, the New York Exchange quotations are the actual quotations of contracts executed on the Exchange for deliveries in forward months; that is, as early as September or even earlier, December, January, March and May contracts are being duly executed on the Exchanges; the cotton thereunder being tenderable in the future months expressly traded on.

The future quotations for the several months not only fluctuate, but the fluctuations for the different months are not in accord, but vary materially. The variations existing on any one day, as between "December" and "March," for instance, may result from a variety of causes affecting the future market as to either month, which might or might not be reflected in the market value of "spots." For instance, on September 4, 1924, the New York Exchange quotations of "March futures" were fourteen points higher than December futures. On October 21st, March futures were forty-four points higher; on November 22nd, sixty-nine points higher; on November 25th forty-seven points higher.

There is a different "basis," therefor, on any date, according as to whether or not the "basis" is the "December basis," "January basis," "March basis," or other month, the basis of any particular future month being, as stated above, merely the difference in the market value at any particular time as to any particular grade of cotton, and the future quotation for the several future months then quoted on the Exchange. In other words, on any date "the basis" is merely a term to express the difference between the market value of a particular cotton for actual delivery over or under the New York Exchange for a particular future month; and there are as many different "basis" as there are future months then quoted on the New York Exchange.

After November 25, 1924, the execution of a "December future" contract on the Exchange became impossible, as with the arrival of December, the futures for that month became tenderable and became "spots," November 25th being the first call day on the Exchange after which future contracts for December could not be executed.

Bahnson testified that December contracts could be bought and sold up to December 24, 1924; but concedes that with December 24th December futures completely ceased to exist; and with the expiration of December future quotations, the "December basis" referred to in the contract in suit also ceased to exist."

It appears that December futures on September 4, 1924 closed at 24.08; on October 21, 1924, at 22:81;—a decline of 127 points.

The witness Bahnson, the manager of complainant's cotton mill, while testifying that futures had declined 127 points between September 4th and October 21, 1924, that the market value of actuals of the kind covered by the contract had not so greatly declined, their declin

being from sixty-seven to eighty-two points. This witness concedes that the decline in futures between September 4th and October 21st, was greater than the advance in basis and that the actual market value—actual cotton of the kind covered by the contract was from sixty-seven to eighty-two points lower on October 21st than on September 4th.

The complainant never did buy in the contract or fix the price on any of the cotton. It appears that the nearest complainant came to supplying the six hundred bales, it bought eight hundred bales of cotton about the 22nd of November 1924 from the Newberger Cotton Company at a flat price of twenty-five cents per pound, a little more than a month (or thirty-two days) after complainants had received notice that defendants were not going to ship it any cotton.

We are of opinion that a valid executory contract was executed between the complainant and defendant about September 4th, 1924, and that while Moore, the broker and agent of the defendants had misled the defendants, yet he had delivered the contract to the complainant, signed by the defendants, and the defendants should be responsible for Moore's conduct and actions as their broker and agent in the delivery of the contract to the complainant. We are further of opinion that it was complainant's duty to fix the price of the cotton on or before October 10th, the date the first seventy-five bales were to be shipped.

The complainant made an impossible demand of the defendants on October 17th when it demanded that defendants ship the amount of cotton due to be shipped on the 10th; yet the complainant did not fix the price. It did not give the defendants shipping instructions as to which of its mills the cotton was to be sent. Draft with bill of lading attached for the purchase price on the installment could not be made without fixation of price as to that installment.

In Voxburg v. Southern Lumber & Manufacturing Company, 147 Tenn., 649, following the Darby case, the court said of such an impossible demand: "If the letter be construed as a notice to ship the lumber, it was nevertheless deficient in that it demanded immediate shipment instead of extending to the defendant a reasonable time within which to ship. Had it been given a reasonable time, it might have complied, while, on the other hand, an immediate shipment might have been impossible."

The contract sued on is a North Carolina contract, having been executed in that state, and it appears that North Carolina had never adopted the Uniform Sales Act. This is admitted by a stipulation found in the transcript, but the Uniform Sales Act does not change the common-law principle that no recovery could be had on an executory contract in which the price was not fixed.

Both at common law and under the Sales Act, and under the Sales Act, in Tennessee and in North Carolina, the ordinary measure of damage for the seller's failure to deliver is the difference between the contract price and the market value at the time and place of delivery; and where the deliveries are by installment, the time of delivery will ordinarily be the date of the delivery of each installment successively, and the damage is arrived at as to each successive installment by taking the difference between the contract price and the market price at the successive delivery dates; or, as is sometimes stated, the sum of the differences between the contract and market price of the quantity of each installment not delivered at the respective times of delivery and place of delivery. Cement Co. v. Oliver, 125 Tenn., 140; Crescent Hosiery Co. v. Mobile Cotton Mills, 140 N. C., 452.

In Tillinghas v. Cotton Mills, 143 N. C., 273, the court said:

"If plaintiff, after he was aware of a defendant's breach of contract, delayed and neglected to purchase against his own sales until there had been an additional rise of the market, an increase of damage on this account should not be allowed him.

"It is an established principle that when there has been a breach of contract, definite and entire, the injured party must do what fair and reasonable business prudence requires to save himself and reduce the damage, or the damage which arises from his own negligence will be considered too remote for recovery."

It is said in Benjamin on Sales, 7th Edition, page 934: "In every case, the buyer to enable him to recover the full amount of damages must have acted throughout as a reasonable man of business and do all in his power to mitigate the loss."

And in Sedgwick on Damages, Vol. 1, section 201: "The same principle which refuses to take into consideration any of the direct consequences of an illegal act is applied to limit the damages where the plaintiff, using reasonable precaution, could have reduced them."

And again in section 202: "It is frequently said that it is the duty of the plaintiff to reduce the damages as far as possible. It is more correct to say that by consequences which the plaintiff, acting as prudent men ordinarily do, can avoid, he is not legally damaged. Such consequences can hardly be the correct or natural consequence of the defendant's wrong, since it is at the plaintiff's option to suffer them. They are readily excluded from the recovery as remote. In this view, the doctrine would rest on the intervention of the plaintiff's will as an independent cause. Ad hoc, he is not damaged by the defendant's act, but by his own negligence or indifference to consequences."

In Hazard v. Hardison, 114 N. C., 482, the contract was for the delivery of logs to plaintiff for manufacture into lumber at plaintiff's mill, the deliveries to extend through a period of five years. The

court held it was plaintiff's duty to have procured logs elsewhere, and he could only recover the difference between the contract price and the cost to procure elsewhere on open market, that is, the market value at the time the contract was breached by the seller, or within a reasonable time thereafter. Said the court: "The damages for a violation of a contract are recoverable only for loss sustained thereby; if no loss accrues, or if, by reasonable diligence, the injured party can reduce the loss, he is under duty to do so."

In Farabee-Treadwell Co. v. Bank & Trust Co., 135 Tenn., 217, by reason of the bank's breach of contract to lend money to a grain dealer, the dealer was compelled to sell his grain on hand at a sacrifice, and sought to recover damage not only for the loss, by reason of the sacrifice sale, based on the market value at the time thereof, but also contended that the market thereafter advanced; and he sought an additional recovery based on the price at which corn thereafter sold on the market. In denying a recovery on the latter basis, the court said: "In the first place, such a claim of damage is purely speculative. The grain market fluctuates and no one can possibly say at this time when the plaintiff would have sold the corn purchased. There might have been a loss on the transaction. At any rate, the amount of the lost profit cannot be determined because it cannot be concluded with any certainty at what stage of the market plaintiff would have sold the grain.

"Moreover, it was the duty of the plaintiff to have done everything possible to mitigate its damage. If it had enjoyed the credit and standing averred in the declaration, it might, after the bank had refused the loan, have procured funds elsewhere and bought other grain and obtained the benefit of the rise in the market."

In Samuels v. Drew, 288 F. R., 279, the damages were claimed based on the market obtaining on the several delivery dates. ·

The court held the market for the forward shipments obtaining at the time of the breach, was controlling: "Ordinarily, in a personal action for a breach of contract of sale, the measure of damages is as claimant contends; but even in such an action, if, on the anticipatory breach, there be a present market price for the goods to be delivered in accordance with the original contract, that price controls, not the market price for immediate delivery either at the time of breach or at the time fixed in the contract for delivery." A ready illustration is a wheat contract, made in December for May delivery, with anticipatory breach in January. The better rule of damages, because of the duty to mitigate damages when reasonably possible, is the difference between the contract price on the one hand, and the market price in January of May wheat, not the price of January cash wheat or May cash wheat, on the other hand, and this even though action be brought or tried after May (Wedgwick, Damages, 9th Ed., par. 636-E.)

Williston on Sales, Vol. II, 587, 599-g and 599-h; Sedgwick on Damages, Vol. II, pp. 1253, 1257; Benjamin on Sales, p. 932; Weld v. Telegraph Co., 199 N. Y., 100.

In Coal Company v. Ice Company, 134 N. C., 574, the suit was for failure to deliver coal agreed to be delivered by defendant between April 12th and May 1st, as ordered. After some of the coal had been delivered, defendant contended that plaintiff had breached the contract and he was not obligated to make further deliveries; but this issue being determined against him on the measure of damages, the court said:

"The ordinary rule as to damage undoubtedly is that when a vendor fails to comply, the vendee is entitled to recover the difference between the contract and the market price at the time of the breach. But, the general rule is subject to the qualification that a party to a contract is required to use reasonable diligence to mitigate the damages caused by the breach, and in contracts of this kind, the vendee should provide himself as cheaply as he conveniently can from the most accessible sources and thus lighten the loss; and his recovery will be curtailed by the sum that might thus have been saved."

Recognizing the rule that for the recovery of general damage, it is not necessary to "buy in," 24 R. C. L., states the rule as to special, consequential or unusual damage: "In fact, as regards the buyer's claim for special damages, it is his duty, in order to mitigate the same, to supply himself by purchase in the market."

"If, however, the seller's promise was executory, it will generally be subject to a condition that the price be paid simultaneously with the transfer of the property. If such a condition exists, whether express or implied, it is obvious that no liability on the part of the seller can arise until the price is not only fixed by the valuation, but is also tendered." Williston on Sales, Vol. 1, page 321.

Said the court in Ellerton Hardware Co. v. Hawes, 122 Ga. Reports, page 865: "Where the parties to an executory agreement for the sale of goods agree that the price to be paid for the property shall be fixed by valuers appointed by them, there is no contract of sale if the persons appointed as valuers fail or refuse to act, and this is true even where one of the parties to such an agreement is the cause of such failure or refusal." (1 Beng. Sales, sec. 87; Beach on Sales, sec. 213; Tiedman on Sales, sec. 46; Thernall v. Balbirnie, 2 C. B. 786; Cooper v. Shuttleworth, 25 L. J. Ex., 114; Vickers v. Vickers, 4 L. Rep. Eq., 529; Milnes v. Gery, 14 Ves. Jr., 400; Wilkes v. Davis, 3 Mer. 507; Hutton v. Pearce, 26 Ark., 382; Fuller v. Bean, 34 N. H., 290.

In Louisville Soap Company v. Thomas J. Taylor, 279 Fed. Rep., 470, decided by the 6th Circuit United States Circuit Court of Appeals, and reported also in 27 A. L. R., page 119, and in which case

petition for certiorari was denied by the Supreme Court of the United States in memorandum opinion in 259 U. S., 583, the contract was for the sale of a year's requirements of rosin, 20,000 round barrels minimum; 40,000 round barrels maximum, the price to be "50¢ per 280 lbs. over the official closing Savannah, Georgia, market" on the day orders were received at Mobile, Alabama. The Soap Company received and paid for 12,989 round barrels, which constituted its full requirements; and refused to accept further deliveries; and defended on the grounds, first, that the contract was a requirement contract, and did not require acceptance of the minimum of 20,000 barrels; and also, that insofar as the contract was executory, that is, as to any remaining barrels not delivered thereunder, no recovery could be had, because by reason of an absence of actual sales, there was no market on the Savannah Board of Trade, official or otherwise. On the same principles that controlled the decision of our court in Hardwick v. Can Company, 113 Tenn., 657, the contract of the Louisville Soap Company was held valid and sufficiently certain to bind it to the acceptance of a minimum of 20,000 barrels, subject to the usual condition of a contract, providing for a subsequent price fixation, namely that insofar as the same is executory, no recovery can be had thereon, unless the price be actually fixed.

The buyer, in that case, had filed cross-claim to recover back payments that it had made for barrels actully delivered on invoices reciting a fixation on the Savannah Board of Trade quotations, when it later developed that these prices had been fixed by a committee arbitrarily, and without any actual sales made on the Board of Trade. This counter claim was denied on the ground of the Soap Company's acquiescence as to the deliveries actually made; but insofar as the contract was executory, the seller was also denied any right of recovery. The court said:

"Where there is a contract to sell goods at a price, or on terms, to be fixed by a third person, this express condition qualifies the obligations of both buyer and seller; and where such third person, without fault of the seller or the buyer, cannot or does not fix the price or terms, the seller is released from his obligation to sell and deliver, and the buyer is released from his promise to accept and pay. This doctrine has been universally applied by the courts not only to contracts of sale, but to many other forms of contract, and it has also been written into the Uniform Sales Act adopted by many states of the Union. Therefore, the motion of the defendant for a directed verdict as to plaintiff's cause of action should have been sustained."

In Preston v. Smith, 67 Ill. App., the court said:

"Contracts for sale at a valuation price, to be fixed by persons named, are implied conditional upon those persons surviving and

making the valuation and are terminated by their death before doing so, the valuation stipulated for having thus become impossible.''

In addition to there being no obstacle to a price fixation in substantial accord with the contract by direct notice to Frohlich & Barbour, all of the proof further shows that if Bahnson was laboring under the apprehension that he had to fix the price by the execution of a future contract through Post & Flagg on the New York Cotton Exchange, even then such a future contract could have been executed by him, and immediately canceled out by an equivalent sale of futures.

In Allen v. Sams, 31 Ga. App., the identical character of contract as involved here, was under construction. It is true, in that case, the questions arose in a somewhat different manner. The determination of the case required, however, the application of many of the same principles on which defendants rely, and in connection with the decision of the Georgia Court of Appeals, it is interesting to note its discussion with reference to the attempted change there from ''March futures'' to ''October futures.'' The bill in this case alleges and seeks to recover as to the cotton to be delivered January 10th of 1.50 basis and for cotton to be delivered January 20th, an alleged advance of ''basis'' to 2.85, or the sum of $1,630.25 of its alleged total loss of $4,068.73 is predicated on an alleged advance of the ''basis'' over December 1924, New York future quotations, obtaining on January 10th and January 20, 1925, when it had become impossible to buy or sell December futures on the New York Cotton Exchange on December 24 1924; and when December future quotations had absolutely ceased to exist by reason of the complete expiration of December, the future month referred to in the contract. Said the court in the Georgia case, supra: ''The seller had delivered the cotton under an express agreement, dated October 29, 1921, providing that the price should be determined at the option of the seller on the basis of 111 points added to the quotations on the Cotton Exchange of New York for ''March.'' The plaintiff alleged that in May, 1922, the buyers had proposed a modification of the contract, to provide the price should be fixed at 111 points added to the quotations on the Cotton Exchange of New York for ''October,'' which the seller had agreed to, the only change proposed, being with reference to the future month of ''October'' being substituted for ''March.'' The seller attempted to exercise his option to ''call'' on June 20, 1922, so as to fix the price by adding 111 points on that day's New York future quotation for ''October.'' The court held that the original agreement, under which the cotton was delivered, was a valid agreement and was not a gambling contract and was enforcible, but was subject to the condition that the price should be fixed as therein specified, and the court held that the subsequent agreement made in

May, 1922, attempting to modify the original agreement to substitute the "October" future quotations for "March" future quotations was invalid, for the reason that the attempted substitution by agreement of the parties was made in May, at which time the price fixation was originally provided, had become an impossibility; and that the original expired agreement could not be legitimately employed as the basis of the new agreement; for the reason, that this new agreement. providing that the price of this previously delivered cotton should be determined by reference to the future condition of the market, was invalid as a gambling contract.

"No call for a settlement was made by the plaintiff until June, 1922. We would not suppose that quotations for March were made on the New York Cotton Exchange in May, 1922, after the month of March in that year had passed. It would thus appear that the method of fixing the price of the cotton, as prescribed by the agreement, had been rendered impossible by the inaction of the plaintiff until subsequent to the time within which the price of the cotton might be determined by the terms of the contract. Referring again to the Civil Code, section 4128, we note that if the ascertainment of the consideration becomes impossible, there is no sale. 'Where the parties to an executory agreement for the sale of goods agree that the price to be paid for the property shall be fixed by valuers nominated in the agreement, there is no contract of sale if the persons appointed as valuers fail or refuse to act as such; and this is true where one of the parties to the agreement is the cause of such failure or refusal.' (Elberton Hardware Company v. Hawes, 122 Ga., 858; 50 S. E., 964.) A valuable consideration is essential to a sale and if its ascertainment becomes impossible, there is no sale."

The court said further: "That is certain which may be made certain, but the validity of the contract was nullified by the failure of the plaintiff to take the necessary action to fix the price in the manner and within the time provided by its terms. The defendant having received the cotton would be liable for its value as of the date of its delivery, less the amount of the advances thereon. The rights of the plaintiff could not be determined under the original contract, but were fixed by the law under the provisions of this code section and, in the absence of a new, valid agreement, could only be enforced upon a quantum valebat. The plaintiff could have no further interest in the cotton or in the fixing of the price under the agreement."

In the instant case, the market value of the identical cotton, covered by the alleged contract was much lower on October 21st than it was on September 4th, and it continued lower for sometime thereafter, and there was certainly no appreciable advance until after the end of December.

It appears that, while December futures were 24.08 on September 4, 1924, and the premium for cotton of staple and grade described in the contract under consideration was 40 points, would make the market value on September 4th of 24.08. On December 24th, the last date on which any December contract could be bought, or sold, on the New York Exchange, December cotton was 23.33; however, it is insisted by complainant that the basis had advanced to about 150 points, and as to futures it is the insistence of complainant that, as the December future market declined basis advanced, and the advance in basis was really the result of the decline in futures. This was brought about by the holders of actual cotton trying to obtain in advance in basis to off-set the decline in futures.

We hold that it was the duty of complainant to fix the price of cotton before it ordered any cotton from defendants; that this would have to be done before the executory contract between the complainant and defendants would be completed. We further find as a fact that all the damages claimed by complainant by reason of the alleged breach of the contract enters into the realm of speculation and that the complainant was not, in fact, damaged in any sum. It was complainant's duty, when defendants notified it that they considered no contract existed between them and that they would not ship any cotton, to purchase 600 bales of cotton on the New York Cotton Exchange, being for December delivery, and add the forty points as a basis to such purchase and to have notified defendants to this effect before complainant would be entitled to insist that it had suffered any damage.

It results that we find no error in the decree of the Chancellor in directing the jury that, under all the proof complainant had suffered no damage by reason of the breach of the executory contract and it was proper for the jury to return a verdict in favor of the defendants.

The assignment of error is overruled and disallowed and the judgment of the lower court is affirmed. Complainant and its surety on appeal bond will pay the costs of the cause, including cost of appeal, for which execution will issue.

Heiskell and Senter, JJ., concur.